**In re ANTILLES YACHTING, INC.
d/b/a Antilles Yachting
Services, Debtor.**

**Bankruptcy No. B–80–00012.**

Bankruptcy Court, Virgin Islands,
D. St. Thomas and St. John.

May 21, 1980.

---

Thomas K. Moore, St. Thomas, Charlotte Amalie, V.I., Reginald Barney, San Juan, P.R., for debtor.

Roger L. Campbell, St. Thomas, Charlotte Amalie, V.I., for Citibank.

Paul Hoffman, St. Thomas, Charlotte Amalie, V.I., for General Creditors Committee.

Rhys S. Hodge, St. Thomas, Charlotte Amalie, V.I., for trustee.

## FINDINGS AND ORDER

WILLIAM T. HOLMES, Bankruptcy Judge.

On April 11, 1980, Citibank, a secured creditor holding a $106,000 mortgage lien on Debtor's property, filed a complaint starting an Adversary Proceeding to lift the automatic stay made operative by Section 362 of the Bankruptcy Reform Act (11 U.S.C. § 362).

The original petition for reorganization was filed February 25, 1980 stating that Debtor intends to file a plan under Chapter 11 of the Code.

The late filed schedules and statements of affairs shows Debtor operates a shipyard on St. Thomas. In addition to Citibank's first mortgage, there is a second mortgage on the shipyard properties held by individuals who are stockholders of Debtor. There is a tax liability of about $7,000 to the Virgin Islands Government. General creditors claims aggregate about $50,000, mostly in relatively small amounts incurred in 1980.

It was not practicable to schedule a Section 362(e) preliminary hearing on Citibank's application earlier than April 28, 1980. The following are the facts developed at that April 28th preliminary hearing.

Citibank's original mortgage was in excess of $200,000. Citibank brought a foreclosure proceeding in the District Court in St. Thomas late in 1978 which was contested. Finally on November 29, 1979, Debtor, acting through its attorney, consented to a District Court judgment of foreclosure in return for an agreement that Citibank

would refrain from seeking a judicial sale for 60 days after the judgment. The consent included a stipulation that after such 60 days, Debtor's interest in its property would be limited to the 6 month right of redemption provided by Virgin Islands Law.

██ Citibank's position at the preliminary hearing was that Debtor was acting in bad faith and that there was no hope of reorganization. Debtor's position was that there was an equity in the security over and above Citibank's lien and that, ipso facto, Citibank was "adequately protected" within the meaning of 11 U.S.C. Section 362(d)(1) and therefore, the Court should do nothing to disturb the stay. Debtor's position avoided the real issues of this application to lift the stay. In a proceeding like this where Debtor must use the security to reorganize, adequate protection involves more than the existence of an equity cushion. cf. *In re Murel Holding Corp.*, 75 F.2d 941 (2 Cir. 1935). The creditor's entire bundle of rights must be considered. Here if Citibank had cash, not a judgment bearing interest at the legal rate of 9%, it could loan the cash at the prime rate which on April 28, 1980 was 20%. The equities at least required that the real issues raised by the application be faced without delay.

In the circumstances, I told the attorneys for Debtor in Court on the 28th, that I would adjourn the preliminary hearing for one week to May 5th, that under 11 U.S.C. Section 362(e) the stay against Citibank would automatically expire thirty days after the Citibank application (May 12, 1980) unless Debtor could convince me to order the stay continued; that therefore the burden was now on Debtor to disclose how it proposed to handle Citibank's claim; that it could not afford to rely on its 120 day period to submit a plan, but if the stay was to be continued, it faced on May 5th, and certainly before May 12, 1980, the problem of persuading the Court Citibank would receive through this reorganization proceeding the indubitable equivalent of its $106,-000 claim, plus interest.

My position on April 28th was so stated because Citibank had put in issue in the complaint to lift the stay that

"Debtor has no reasonable prospect for reorganization".

██ Here there must be a reasonable prospect for a going concern reorganization to justify continuing the stay provided by the Bankruptcy Code. The stay is not an end in itself. The end is reorganization and, if reorganization is not going to be achieved, Citibank should have relief either by having the stay lifted or by having the secured property sold with its lien transferred to the proceeds.

On April 28th it also appeared that there was nothing in the proposed Antilles Yachting reorganization that should be so new or surprising as to require additional time for the Debtor to tell the Court what it proposed to do for Citibank. The obvious purpose of this reorganization proceeding is to try to refinance the Bank's lien on Debtor property which Debtor has been trying to do for over two years. There are only three classes of creditors—(1) Citibank, whose claim is totally secured and must be satisfied first; (2) the stockholders who purport to hold the junior liens and who have stated that on a plan, they would agree to subordinate themselves to general creditors; and (3) the general creditors, whose claims are $50,000 or less.

Part of the valuation problems in appraising a plan are eliminated here because Debtor and Citibank both agree that Debtor's property would bring more than enough at a judicial sale to satisfy in full Citibank's claim, plus interest. A plan to be confirmed must meet the requirements of 11 U.S.C. § 1129(a)(7). This section states the so called "best interest of creditors" test under which the Court must find each claim holder who has not accepted the plan (Citibank), will receive property of a value not less than the amount it would receive if Debtor were liquidated.

In itself, the "best interest of creditors" test is not new. It has a history in bankruptcy going back to former Section 12 of the Bankruptcy Act and Section 366 of Chapter XI, dealing with compositions

among secured creditors, where the "best interests of creditor" test was applied generally to compare asset liquidating values against going concern values. Here the application of the test is new since Section 1129(a)(7) applies the test to a single secured creditor in a situation where going concern value is questionable but liquidating value is ample for that creditor.

I have held four hearings to allow Debtor a full opportunity to state how it proposed to handle Citibank. At the third hearing on May 12, 1980, Debtor's current General Manager testified at length on a proposed plan under which Citibank would be paid out in at least 60 level payments with interest at 9%. In addition, balloon payments would be made to Citibank equal to 50% of Debtor's net profits after taxes. The General Manager estimated this plan would pay out Citibank in about 2½ years because of the payments out of expected profits. The General Manager's projection assumed profits would be double the rate of the last seven months, but that the cash requirements of the enterprise would not increase. The 9% interest rate used is the legal Virgin Islands rate on foreclosure judgments. Citibank's loan to Debtor was at 3% above prime or about 20%. With the prime currently at 17%, Citibank obviously could earn substantially more on a cash liquidation of Debtor than the forced 9% investment proposed by the plan, even if the estimated income and cash flow proved to be accurate.

At the end of the hearing on May 12th, I told the attorneys for the Debtor, I could not continue the stay if the proposed plan was the best they could make. If they were going to stand on the proposed plan, either the stay would be lifted or a trustee would be appointed to sell Debtor's assets. At Debtor's request, the stay was continued to May 20th to see what improvements could be made in its plan. There were no major changes proposed at the May 20th hearing.

Debtor's accounts are on a fiscal year ending September 30th. In almost all the years prior to September 30th, 1979, Debtor lost money, having an accumulated earned surplus deficit of more than $370,000, of which $70,000 is attributable to the year ended September 30, 1979. In the seven months ended April 20, 1980, Debtor earned $24,000 before taxes. These earnings would quickly disappear if some of the receivables went bad, many of which are over 90 days old. If it is forced to pay all its taxes and other Government obligations, it will probably run out of working capital and be forced to shut down. Thus to be feasible, any reorganization will require substantial additional working capital.

In pages 13 and 14 of its Disclosure Statement pursuant to 11 U.S.C. § 1125, Debtor makes the following statements as to the risks of its business:

B. "Antilles is a small business with limited access to additional working capital. Better financed and larger concerns could compete for Antilles customers on a more effective basis despite the strategic location of the company".

F. "Operating a shipyard requires a high fixed cost (and large capital investment) but the costs of goods sold are primarily variable. Hence, the break even point is high in relation to total revenues. A moderate drop in volume can cause significant losses although the converse is true (a small) increase in revenues can yield high profits".

G. "Although Antilles' primary market are wealthy boat owners who are usually unaffected by brief ressessionary periods, a sustained period of economic slowdown of substantial duration could place the company in a position where it would require additional financing and there is no absolute assurance that such additional financing would be available at this time".

Robert S. MacArthur, President and stockholder of the Debtor, who said he spoke for other major stockholders, testified that neither he nor the other stockholders would put anymore money in the enterprise. This attitude is consistent with the plan of the controlling stockholders to pay

Citibank out of earnings and with their belief that this is a risky enterprise.

In the May 20th, 1980 plan, Debtor proposed a payment of $30,000 to Citibank to reduce its loan to about $80,000 and a payout from future cash flow at the prime rate plus 3%. The $30,000 payment is to come from a Delaware Corporation of unknown worth which will take over the assets of the Debtor. This, it is said, will restore Citibank to the position it had prior to foreclosure judgment. The argument goes: (a) The May 20th plan leaves Citibank's claim not impaired because defaults in the original loan agreement have been cured and Citibank's legal, equitable and contractual rights are unaltered under 11 U.S.C. § 1124(1), with the result that (b) Citibank, as creditor not impaired, must be deemed to have accepted the May 20th plan under 11 U.S.C. § 1126(b) and (c) the liquidation test of 1129(a)(7)(ii) is therefore not applicable.

■ An elementary analysis of legal rights makes evident that a lien holder with a confessed judgment of foreclosure, containing a deficiency judgment against two individuals, is "impaired" if forced to forego payment of that judgment and instead to make a forced investment in a risky enterprise under a management demonstrated to the lien holder to be unreliable. I find Citibank's claim is impaired by Debtor's May 20th, 1980 plan which makes a substantial alteration of Citibank's legal, equitable and contractual rights and that the May 20th plan cannot be confirmed under 1129(a)(7).

In this proceeding Mr. MacArthur, who has testified he was negligent in the management of Debtor and Mr. Feyling, are asserting rights as creditors that may be subject to attack and are using this purported creditor position to enlist the aid of unsecured creditors. It is obviously in the controlling stockholders interests to delay this proceeding in the vague hope that someone will appear with financing to bail them out enabling them to avoid the possibility of a deficiency judgment. Delay is not in the interest of anyone else. Because of the conflicts, a Debtor dominated by these controlling stockholders is not in a position to discharge the fiduciary responsibilities imposed by 11 U.S.C. § 1107. Indeed, the two plans thus far proposed are really the plans of these two individuals presented to delay solution of the problems of this Debtor. It is now over six months since the attorney for the Debtor signed a settlement agreement in foreclosure.

In addition to the foregoing, I make the following findings and order:

1. Citibank is entitled to its liquidating value of $106,000, plus interest and costs, either in cash or in the substantial equivalent of cash; Debtor's plans dated May 8, 1980 and May 20th, 1980 cannot provide Citibank with the amount it would receive if Debtor were liquidated;

2. The refusal of Debtor's stockholders to contribute substantial additional capital and their insistence on paying Citibank out of future earnings make it improbable, if not impossible, for Debtor to propose a plan that can be confirmed under 11 U.S.C. § 1129(a)(7).

3. Debtor has been mismanaged by its controlling stockholders who have conflicts of interest with other creditors. It is in the best interest of creditors and of some of the stockholders that a trustee be appointed;

4. Mr. MacArthur, President of Debtor, and Mr. Feyling, controlling stockholders, have major conflicts of interest, and must not participate in the management of Debtor during these proceedings. Because of these conflicts of interest, any claims of these parties will not be deemed allowed merely because they have been scheduled or otherwise mentioned by Debtor in possession, such scheduling to be treated as self serving declarations.

5. Any reorganization of Debtor will probably require new capital, supplied by others than the present controlling stockholders. It may be in the best interests of all creditors for the entire assets of Debtor to be sold as a going concern. This may bring the best price and a payout for general creditors;

6. It is not unjust to continue the stay against Citibank for a short additional period. Absent bankruptcy, Citibank would have been entitled to specific enforcement of Debtor agreements for sale made in the settlement of the foreclosure suit. A sale by this Court without any equity of redemption should bring Citibank money at about the same time the equity of redemption would have expired if sale had been made under the foreclosure decree.

The foregoing findings shall constitute findings in support of my order of May 20, 1980, refusing to confirm Debtor's plans of May 8 and May 20, 1980 and appointing a Trustee. In addition it is

ORDERED that any claims of controlling stockholders MacArthur or Feyling will be barred from participation in this proceeding as creditors or stockholders unless each (1) files a verified claim with the Clerk of the Bankruptcy Court on or before June 15, 1980, (2) stating in detail the consideration paid for each item of such claim.