**In re DEVELOPMENT, INC., Debtor.**

**Bankruptcy No. 83–00345.**

United States Bankruptcy Court,
D. Hawaii.

Jan. 27, 1984.

Christopher L. Lau, Patrick Y. Taomae, Don Gelber, Honolulu, Hawaii, for creditor.

Jerrold K. Guben, Honolulu, Hawaii, for debtor.

ORDER RE: MOTION FOR ORDER GRANTING RELIEF FROM AUTOMATIC STAY

JON J. CHINEN, Bankruptcy Judge.

On August 17, 1983, Commercial Finance, Ltd., hereinafter "Commercial", filed herein a Motion For Order Granting Relief From Automatic Stay, hereinafter "Motion",

seeking relief pursuant to 11 U.S.C. § 362(d) from the automatic stay under 11 U.S.C. § 362(a) to allow the continuation of that certain foreclosure action pending in the Circuit Court of the First Circuit of the State of Hawaii, designated *Commercial Finance, Limited vs. Norfolk Investment Co., Ltd., et al.,* Civil No. 71594, hereinafter "Civil No. 71594", including, but not limited to, the foreclosure sale of that certain real property identified by Tax Map Key (1) 2–9–24–01 and located on Waahila Ridge, Manoa Valley, City and County of Honolulu, State of Hawaii, hereinafter "Property".

A preliminary hearing on the Motion was held before the Court on September 13, 1983, at which time the automatic stay under 11 U.S.C. § 362(a) was continued in effect pending a final hearing on the Motion and a ruling thereon by the Court.

A final hearing on the Motion was held on December 12, 28, and 30, 1983.

During the course of the final hearing, Teruo Himoto, the President of Commercial, and John Turner of Alexander & Alexander, Inc., a real estate appraiser, testified on behalf of Commercial. Mark Yates, a real estate appraiser and the Secretary of Pacific, Ralf Graumann of John Child & Company, Inc., and Stanley Yim of Stanley Yim & Associates, Inc., a consulting engineer, testified on behalf of Pacific. Development did not present any witness at the final hearing.

Based on the files and records herein, the exhibits admitted into evidence, the testimony given by the witnesses, the legal memoranda submitted by the parties, and the oral arguments of counsel, and the Court being otherwise fully advised in the premises, the Court hereby makes the following Findings of Fact, Conclusions of Law, and Order.

## FINDINGS OF FACT

1. At all times relevant herein, Norfolk Investment Co., Ltd., a Hawaii corporation, hereinafter "Norfolk", was and still is the fee simple owner of the Property, which consists of 52 acres of vacant undeveloped land, approximately 37 acres of which are zoned P–1 (Preservation) and approximately 15 acres of which are zoned R–4 (Residential).

2. On December 26, 1978, Norfolk, as mortgagor, executed a Mortgage in favor of Realty Fund, Inc., as mortgagee, covering the Property, as and for security for the repayment of an indebtedness in the principal sum of $850,000.00, the same having been recorded on December 27, 1978. On December 27, 1979, Norfolk, as mortgagor, also executed a Mortgage in favor of Commercial Packing Co., Inc., as mortgagee, covering the Property, as and for security for the repayment of an indebtedness in the principal sum of $525,000.00, which mortgage was recorded on December 27, 1978 and which was subsequently assigned to Bernard Fineman and Helen Fineman, hereinafter collectively "Finemans", pursuant to an Assignment of Mortgage dated December 3, 1979, the same having been recorded on August 5, 1980.

3. On September 4, 1979, Norfolk, as seller, and Development, a Hawaii corporation, as purchaser, entered into an Agreement of Sale, the same having been recorded on November 21, 1979, wherein Norfolk agreed to sell and Development agreed to purchase the Property. Development in turn sold the Property to East Manoa Joint Venture by way of a Sub-Agreement of Sale dated October 10, 1979, the same having been recorded on November 21, 1979, which Sub-Agreement of Sale was subsequently assigned to Development through an Assignment of Sub-Agreement of Sale dated August 14, 1981, the same having been recorded on August 14, 1981.

4. On August 30, 1979, for value received, Development made, executed, and delivered to Pacific, a Hawaii corporation, a promissory note in the principal sum of $1,475,000.00. To secure the repayment of the principal sum, interest, and other charges set forth in said promissory note, on August 29, 1979, Development, as mortgagor, executed a Mortgage in favor of Pacific, as mortgagee, covering the aforementioned Agreement of Sale and the same

having been recorded on November 21, 1979. As further security for the repayment of said indebtedness, Development, as assignor, also executed a Security Agreement (Assignment of Purchaser's Interest Under Agreement of Sale) in favor of Pacific, as assignee, the same having been recorded on November 21, 1979, wherein Development assigned to Pacific all of its right, title, and interest in the aforementioned Agreement of Sale.

5. On August 12, 1981, Commercial, a Hawaii corporation, made a loan to Norfolk, in consideration for which Norfolk made, executed, and delivered to Commercial a promissory note in the principal sum of $1,100,000.00, hereinafter "Commercial Note", the same providing for interest at the rate of 18% per annum. The repayment of the principal sum, interest, and other charges set forth in the Commercial Note was secured by a Mortgage dated August 12, 1981 and executed by Norfolk, as mortgagor, in favor of Commercial, as mortgagee, hereinafter "Commercial Mortgage", covering the Property and the same having been recorded on August 14, 1981.

6. Upon the execution and recordation of the Commercial Mortgage, the Mortgage in favor of Realty Fund, Inc. was released. Further, through various Subordination Agreements dated July 27, 1981 and August 14, 1981, the same having all been recorded on August 14, 1981, the Mortgage in favor of the Finemans was subordinated to the Commercial Mortgage; and the aforementioned Agreement of Sale and Sub-Agreement of Sale and the Mortgage and Security Agreement in favor of Pacific were all subordinated to the Commercial Mortgage and the Mortgage in favor of the Finemans.

7. On December 18, 1981, the Department of Land Utilization of the City and County of Honolulu approved a proposed 62-unit cluster development on the Property, hereafter "Cluster Development", which approval, hereinafter "Cluster Approval", was originally due to expire on December 18, 1983. Through an extension granted on July 18, 1983, however, the Cluster Approval is presently due to expire on December 18, 1984.

8. The Commercial Note provided that the loan by Commercial to Norfolk was to be repaid in the following manner: (a) monthly interest-only payments of $16,500.00, commencing on September 1, 1981, and (b) payment in full of the principal sum of $1,100,000.00 on or before August 12, 1982. To this latter effect, Mr. Himoto testified that the term of the loan by Commercial to Norfolk was only one (1) year because Development had anticipated obtaining the Cluster Approval and the financing for the Cluster Development within such one-year period, at which time the Commercial Note would be satisfied in full. However, while the Cluster Approval was obtained, the financing for the Cluster Development was never obtained. Although Norfolk made four (4) interest-only payments totally approximately $58,500.00, the last of which was made on December 31, 1981, Norfolk has not since made any further payments required under the Commercial Note.

9. On June 4, 1982, Commercial initiated Civil No. 71594 against, among other defendants, Norfolk, Pacific and Development, therein seeking the recovery of all amounts due and owing under the Commercial Note and the foreclosure on the Commercial Mortgage.

10. At the request of Development, Commercial subsequently agreed to refrain from prosecuting Civil No. 71594 for a limited period of time covering approximately seven (7) months in order to allow Development the opportunity to privately market the Property. Although interest in the Property was expressed by several prospective buyers, Development was eventually unable to successfully market the Property to a private buyer.

11. In late 1982, Mr. Vernon Koike, who was then the President of Development and also a real estate broker, discussed with T.H. Davies & Co. a sale of the property at a figure between $4 and $5 million based upon a 1980 appraisal report.

12. However, the discussion with T.H. Davies & Co. fell through, and, though there was a 1980 appraisal analysis by Mr. Halstrom showing a value exceeding $4 million dollars, Mr. Koike felt that $4 to $5 million was unreasonable. Thereafter Mr. Koike discussed a sale price of $2 to $3 million dollars with Honolulu Federal Savings & Loan. This negotiation, however, also fell through.

13. Pacific also said it will buy out Commercial, but it was not able to raise the necessary funds.

14. As a result of Development's failure to market the Property, Commercial resumed its foreclosure proceeding and, on May 25, 1983, obtained an interlocutory decree of foreclosure in Civil No. 71594, pursuant to which co-commissioners were appointed to sell the Property through a foreclosure sale. A foreclosure sale at public auction was scheduled for July 21, 1983.

15. On July 18, 1983, Development filed herein a voluntary petition under Title 11 of the *United States Code,* thereby initiating the above-captioned Chapter 11 proceeding and automatically staying the continuation of Civil No. 71594 against Development and its interest in the Property under 11 U.S.C. § 362(a).

16. Consequently, on August 17, 1983, Commercial filed herein the instant Motion seeking relief pursuant to 11 U.S.C. § 362(d) from the automatic stay to allow the continuation of Civil No. 71594 against Development and its interest in the Property, including, but not limited to, the foreclosure on the Commercial Mortgage. Commercial has contended that it is entitled to such relief from the automatic stay on the alternative grounds that (a) there is cause for the same, including the lack of adequate protection, and/or (b) Development has no equity in the Property and the Property is not necessary for an effective reorganization.

17. The evidence presented at the final hearing held on December 12, 28 and 30, 1983 focused on the value of the Property and the priorities and amounts of the liens thereon. The undisputed evidence presented thereon established that:

a. Commercial has a first lien on the Property, the same securing the repayment of an indebtedness due and owing to Commercial by Norfolk. As of November 20, 1983, the total amount of said indebtedness, including principal, interest, and other charges, was $1,479,605.00, with interest accruing from and after November 21, 1983 at the rate of $542.47 per diem.

b. The Finemans have a second lien on the Property, the same securing the repayment of an indebtedness due and owing to the Finemans by Norfolk, which lien is junior to the lien of Commercial. As of March 14, 1983, the total amount of principal and interest of said indebtedness was $278,901.00, with interest accruing from and after March 15, 1983 at the rate of $82.62 per diem.

c. Pacific has a lien on the aforementioned Agreement of Sale, the same securing the repayment of an indebtedness due and owing to Pacific by Development, which lien and Agreement of Sale are junior to the liens of Commercial and the Finemans. As of December 27, 1983, the total amount of principal and interest of said indebtedness was $2,100,968.00, with interest accruing from and after December 28, 1983 at the rate of $525.34 per diem.

18. The undisputed evidence further shows that the subject Property is unique in that it is a narrow, elongated hillside property, bounded on the upper side by a conservation area and on the lower side by Manoa Stream. The conservation area produces a large water run-off, protection against which must be considered in the cost of development. In addition, the poor soil condition will require unusual on-site improvement costs. The Property is therefore a difficult property to develop.

19. The testimony of Turner and Graumann presented great variance as to the value of the Property. In his appraisal, Mr. Turner first employed the subdivision approach to test the feasibility of developing the Property with the Cluster Approval. In employing the subdivision approach, Mr.

Turner relied upon estimates of site improvement costs and building construction costs provided to him by Belt, Collins & Associates, licensed civil engineers, and Maurice H. Yamasato & Associates, licensed architects. Based on the subdivision approach, Mr. Turner testified that the Cluster Development was not feasible and that the Cluster Approval therefore had no value.

20. After concluding that the Cluster Development was not feasible, Mr. Turner applied the market comparison approach to estimate the market value of the Property. In doing so, Mr. Turner relied on five (5) comparables. Based on the comparison approach, Mr. Turner testified that the market value of the Property, either with or without the Cluster Approval, was $1,375,000.00. Further, Mr. Turner testified that the value of the Property under "distress sale" conditions, either with or without the Cluster Approval, was $1,000,000.00.

21. In his appraisal of the Property, Mr. Graumann utilized only the market comparison approach. Mr. Graumann testified that he did not utilize the subdivision approach because he considered it to be speculative and that he therefore did not determine whether or not the Cluster Development was feasible. Based solely on the market comparison approach, Mr. Graumann testified that the market value of the Property was $2,400,000.00 with the Cluster Approval and $1,000,000.00 without the Cluster Approval, while the value of the Property under "forced sale" conditions was $1,560,000.00 with Cluster Approval and $550,000.00 without Cluster Approval. However, Mr. Graumann's testimony as to the value of the Property with the Cluster Approval was strictly based on the assumption that the Cluster Development was feasible and that the Cluster Approval therefore had value. To this latter effect, Mr. Graumann testified that if the Cluster Development was not feasible and the Cluster Approval therefore had no value, then the market value of the Property and the value of the Property under "forced sale" conditions would be approximately $1,000,000.00 and $550,000.00, respectively, namely, the value of the Property without the Cluster Approval.

22. Although Mr. Graumann testified that he did not use the subdivision approach because it was too speculative, Mr. Yim, a consulting engineer who testified on behalf of Pacific, stated that although he was never requested to, and consequently did not determine whether or not the Cluster Development was feasible, he would have been able to determine the same under the subdivision approach and that such a determination would not have been speculative.

23. Although over six (6) months have elapsed since Development initiated its Chapter 11 case, Development has not filed a plan of reorganization. Further, no evidence was presented at the final hearing by either Pacific or Development regarding any reorganization of Development or the development or sale of the Property. No feasibility study of the Property has been made by Pacific or Development.

24. To the extent that the foregoing Findings of Fact constitute Conclusions of Law, they shall be so considered.

## CONCLUSIONS OF LAW

1. 11 U.S.C. § 362(d) provides that a party in interest, on request and after notice and a hearing, may obtain relief from the automatic stay, such as a termination, annullment, modification, or conditioning of the automatic stay:

(1) for cause, including the lack of adequate protection of an interest in property of such party in interest; or

(2) with respect to a stay of an act against property, if—

(A) the debtor does not have an equity in such property; and

(B) such property is not necessary to an effective reorganization.

2. Since the above-quoted language of 11 U.S.C. § 362(d) is phrased in the disjunctive, in order to obtain relief from the automatic stay, Commercial need prevail on only one (1) of the two (2) alternative tests set forth therein. *La Jolla Mortgage Fund*

*vs. Rancho El Cajon Associates,* 18 B.R. 283 (Bkrtcy.S.D.Cal.1982).

3. Pursuant to 11 U.S.C. § 362(g), Commercial has the burden of proof only with respect to the issue of Development's equity in the Property, while Pacific and Development have the burden of proof on all other issues. *In re Hutton-Johnson Co., Inc.,* 6 B.R. 855 (Bkrtcy.S.D.N.Y.1980), *In re Monroe Park,* 17 B.R. 934 (D.C.Del.1982).

A. *Is there Equity in the Property?*

4. In determining whether Development has any equity in the Property, all liens encumbering the Property must be considered, regardless of whether or not all lienholders have requested relief from the automatic stay. *In re Mikole Developers,* 14 B.R. 524 (Bkrtcy.E.D.Pa.1981); *La Jolla Mortgage Fund vs. Rancho El Cajon Associates, supra.* Therefore, if the aggregate amount of the liens of Commercial, the Finemans, and Pacific exceed the value of the Property, then Development has no equity in the Property.

5. The aggregate amount of the liens encumbering the Property totals approximately $4,000,000.00. In comparison, the highest evaluation of the Property did not exceed $2,400,000.00. Consequently, it is patently clear that Development has no equity in the Property.

6. Even if only Commercial's lien is considered, there is no equity in the Property based on the Court's analysis of the market value of the Property.

7. Two appraisers have testified and submitted appraisal reports concerning the value of the Property. However, the Court cannot completely rely on either appraisal report, for the Court finds flaws in both reports.

8. Mr. Turner relied on the subdivision approach to test the feasibility of the Cluster Development and found a negative land value. In using the subdivision approach, Mr. Turner relied on estimates presented to him by an engineer, an architect and a real estate brokerage firm without checking the estimates. These figures were challenged by Mr. Yim, an engineer called as a witness by Pacific. In addition, Mr. Turner added contingencies as separate items in addition to the contingencies already provided for by the engineers and architects in their estimates.

9. Further, although acknowledging that the site improvements would be more expensive for a regular subdivision than for a cluster subdivision, Mr. Turner stated that, the Cluster Approval does not add value to the subject Property and that the market value was $1,375,000.00 with or without the Cluster Approval on a normal sale. At a "distress sale", Mr. Turner estimated the market value, with or without the Cluster Approval, to be $1,000,000.00.

10. Mr. Graumann, on the other hand, testified that the market value of the Property was $2,400,000.00 with the Cluster Approval and $1,000,000.00 without the Cluster Approval on a normal sale, and that the market value under a "forced sale" would be $1,560,000.00 with the Cluster Approval and $550,000.00 without the Cluster Approval.

11. Mr. Graumann acknowledged, however, that he did not make a feasibility study of the Property with or without the Cluster Approval. Thus, he does not know the projected sales revenue, the time necessary to develop the Property, or the cost and availability of financing of the project. Mr. Graumann thus does not know whether a Cluster Development is feasible.

12. An appraisal of a property is not the result of a scientific analysis. *In Re Mikole Developers, Inc., supra.* It is an educated opinion, based upon the experience and analysis of the appraiser. The Court may be guided but is not bound by an appraisal report.

13. In the instant case, there is other evidence of the market value of the Property. Mr. Himoto testified that Mr. Koike, a real estate broker, tried unsuccessfully to market the Property with the Cluster Approval in the $4–$5 million range and then, also unsuccessfully, in the $2–$3 million range.

14. Because of Mr. Koike's unsuccessful effort to sell the Property for over seven (7) months even at $2,000,000.00, and based upon the appraisal reports of Mr. Turner and Mr. Graumann, the Court concludes that the market value of the Property without the Cluster Approval is $1,000,000.00 and with the Cluster Approval is $1,500,-000.00 on a "normal sale" and $750,000.00 and $1,000,000.00 respectively, at a "forced sale". The Court concludes that the Cluster Approval increases the value of the Property by 50%.

15. The foregoing analysis is supported by one of the comparables presented by Mr. Graumann. Mr. Graumann's comparable No. 5 covers a parcel of land at Kaneohe, Oahu, which was purchased in June 1979 without a Cluster Approval for $450,000.00 and sold in May 1982 with a Cluster Approval at $750,000.00. This shows a 66⅔% increase in value.

16. However, comparable No. 5 is located on gradual sloping ground and thus does not present the development problems of a narrow elongated Property with poor soil, bounded by a conservation area and a stream. Thus, the Court gave a 50% increase in value for the Cluster Approval for the subject Property, rather than a 66⅔% increase as indicated by the data on Mr. Graumann's comparable No. 5.

17. Since the market value of the Property with the Cluster Approval is $1,500,000.00 and since Commercial's lien on the Property exceeds $1,500,000.00, the Court finds that, even if we consider only Commercial's lien, there is no equity in the Property.

**B. *Is the Property necessary for an effective reorganization?***

18. In meeting their burden of showing that the Property is necessary for an effective reorganization, Pacific and Development must do more than merely so assert. The fact that the Property may be indispensable to Development's survival is insufficient, without more, to maintain the automatic stay and deny Commercial relief therefrom. *In re Mikole Developers, supra;*

*In re Terra Mar Associates,* 3 B.R. 462 (Bkrtcy.D.Conn.1980). As explained by the court in *In Re Clark Technical Associates, Ltd.,* 9 B.R. 738 (Bkrtcy.D.Conn.1981):

> It is not enough for a debtor to argue that the automatic stay should continue because it needs the secured property in order to propose a reorganization. If this were the test all property held by debtors could be regarded as necessary for the debtor's reorganization. The keyword under 11 U.S.C. § 362(d)(2)(B) is "effective"; ...
>
> If all the debtor can offer at this time is high hopes without any financial prospects on the horizon to warrant a conclusion that reorganization in the near future is likely, it cannot be said that the property is necessary to an "effective" reorganization. (Citations omitted). *Id.* at 740.

19. Therefore, in order to discharge their burden of establishing that the Property is necessary for an effective reorganization, Pacific and Development are required to demonstrate that there exists a reasonable likelihood of a successful reorganization within a reasonable period of time. *In the Matter of Sundale Associates, Ltd.,* 11 B.R. 978 (Bkrtcy.S.D.Fla.1981).

20. To this effect, neither Pacific nor Development has presented any evidence to establish that a successful reorganization or the potential development or sale of the Property within a reasonable period of time is even remotely probable. In fact, although Development initiated the above-captioned Chapter 11 case nearly six (6) months ago, it has failed to file a plan of reorganization. Also, there was no evidence to indicate that a prospective investor or buyer is currently ready, willing, and able to refinance or purchase the Property. Although there was testimony to the effect that Development has attempted to procure such a prospective investor or buyer in the past, such attempts have been wholly unsuccessful.

21. Essentially, Pacific and Development have only requested that they be afforded time within which to market the Property by way of a private sale, which

would be at the expense of Commercial. As a secured creditor, Commercial is not obligated and should not be required to finance such marketing of the Property or Development's reorganization in connection therewith. *In re 5-Leaf Clover Corp.,* 6 B.R. 463 (Bkrtcy.S.D.W.Va.1980).

22. Hence, any plan of reorganization proposed by Development would amount to nothing more than hope that an investor or buyer may yet be found. In the analogous case of *In re Terra Mar Associates, supra,* the court commented as follows:

> The short of it is that the debtor is utilizing the . . . stay, hoping that somewhere, someone will fund an arrangement or refinance the mortgage with the plaintiff. This is entirely too slim a reed upon which this court should exercise its discretion and keep the plaintiff at bay while the debtor continues to pray. *In re Groundhog Mountain Corp.,* 1 B.C.D. 923 (Bankr.S.D.N.Y.1975).

23. In failing to present any evidence to show that there exists a realistic prospect for a successful reorganization or for the development or sale of the Property within a reasonable time, Pacific and Development have utterly failed to meet their burden of establishing that the Property is necessary for an effective reorganization.

24. As a result, because Development has no equity in the Property and the Property is not necessary for an effective reorganization, Commercial is entitled to obtain relief from the automatic stay.

C. *Adequate Protection.*

25. Since Commercial has sought relief from the automatic stay under both subsections (1) and (2) of 11 U.S.C. § 362(d), in order to successfully retain the automatic stay in effect, the burden is upon Pacific and Development to establish that Commercial's interest in the Property is adequately protected. Otherwise, under 11 U.S.C. § 362(d)(1), Commercial would be entitled to obtain relief from the automatic stay. *In re Hawaii Pacific Package Store, Inc.,* 1 C.B.C.2d 764 (Bankr.Haw.1980); *In re Virginia Foundry Company, Inc.,* 9 B.R. 493 (D.C.W.D.Va.1981).

26. This concept of adequate protection, which is derived from the Fifth Amendment's protection of Property interests, was designed to ensure that a creditor with a secured claim receive essentially what such creditor bargained for. Therefore, such adequate protection must be completely compensatory. *In re Murel Holding Corporation,* 75 F.2d 941 (2d Cir.1935); *In re Virginia Foundry Company, Inc., supra; In re Monroe Park, supra; La Jolla Mortgage Fund vs. Rancho El Cajon Associates, supra.*

27. 11 U.S.C. § 361 sets forth three (3) non-exclusive methods by which adequate protection of Commercial's interest in the Property may be provided. The first two (2) methods of providing such adequate protection, to wit: (a) periodic cash payments from the debtor or the party opposing relief from the automatic stay to the secured creditor, and (b) additional or replacement liens on other property of the debtor, were not and have never been proposed by either Pacific or Development. As a result, unless such adequate protection is provided pursuant to the third method, Commercial is entitled to relief from the automatic stay.

28. The third method of providing such adequate protection is the "catch all" provision permitting such other means of adequate protection as will result in the realization by the secured creditor of the "indubitable equivalent" of its interest in the Property of the debtor.

29. To this latter effect, Pacific and Development have apparently relied solely upon the Property itself to provide such adequate protection as will result in the realization by Commercial of the "indubitable equivalent" of its interest in the Property.

30. Although some courts have found that the collateral for a secured creditor's lien may itself provide adequate protection thereof under certain circumstances, it has been repeatedly and consistently held that such collateral does not itself provide the requisite adequate protection where the amount of the secured creditor's claim exceeds the value of the collateral. *In re*

*Riviera Inn of Wallingford, Inc.,* 7 B.R. 725 (Bkrtcy.D.Conn.1980), *In re Gaim Development Corp.,* 9 B.R. 17 (Bkrtcy.S.D.Fla.1981); *La Jolla Mortgage Fund vs. Rancho El Cajon Associates, supra.*

31. In the instant case, as above shown, the Court has found the market value of the Property at a normal sale to be $1,000,000.00 without the Cluster Approval and $1,500,000.00 with the Cluster Approval and $750,000.00 and $1,000,000.00 respectively at a distress sale.

32. Development has contended that Commercial has a lien only on the Property and not on the Cluster Approval. If this were so, Commercial could look only to the Property without the Cluster Approval for adequate protection. Because Commercial's lien exceeds the market value of the Property either with or without the Cluster Approval, the Property itself cannot provide adequate protection to Commercial. And neither Development nor Pacific has offered any additional security to Commercial to provide adequate protection under the code.

33. Even if the Court held that the value of the Property with the Cluster Approval was 66⅔% higher than without, thus evaluating the Property at $1,666,000.00 and finding debtor to have some equity beyond Commercial's lien, said equity would not be sufficient to provide adequate protection to Commercial.

34. The interest on Commercial's loan continues to increase at the rate of $16,500.00 a month. If a minimum of six (6) months are necessary to sell the Property with the Cluster Approval, the interest on Commercial's claim would be increased by $99,000.00 during such period, increasing Commercial's claim to $1,599,000.00. Sales commission and other costs, estimated at 6% of $1,666,000.00 or $99,960.00 must also be paid from the proceeds, leaving $1,566,400.00, which is less than Commercial's claim. The Court thus finds that even if $1,660,000.00 were realizable within 6 months hence Commercial would not be adequately protected.

35. Courts have held that, even where there is some equity in the property, when the equity cushion is being eroded by the continuous increase in the daily interest costs of the mortgage, there is no adequate protection to the mortgagee. *In re H & F Investment Company, Ltd.,* 9 B.R. 548 (Bkrtcy.N.D.Ohio 1981); *In re Stuart Motel, Inc.,* 8 B.R. 50 (Bkrtcy.S.D.Fla.1980).

36. Many courts have recognized that the concept of adequate protection involves more than the existence of an "equity cushion". As stated by the court in *In re Antilles Yachting, Inc.,* 4 B.R. 470 (Bkrtcy.Virgin Islands 1980):

> In a proceeding like this where Debtor must use the security to reorganize, adequate protection involves more than the existence of an equity cushion . . . . The creditor's entire bundle of rights must be considered.

*Id.* at 472.

37. Therefore, in determining whether a creditor is being provided adequate protection of its secured claim, the secured creditor's right to receive immediate payment of its claim in accordance with its demand instrument and with resort to its security is a valuable right. To deprive such secured creditor of this right is to deprive him of value. *In re Virginia Foundry Company, Inc.,* 9 B.R. 493 (D.C.W.D.Va.1981). This right of a secured creditor was recognized long ago by Judge Learned Hand in *In re Murel Holding Corporation,* 75 F.2d 941 (2d Cir.1935):

> It is plain that "adequate protection" must be completely compensatory; and that payment ten years hence is not generally the equivalent of payment now. Interest is indeed the common measure of the difference, but a creditor who fears the safety of his principal will scarcely be content with that; he wishes to get his money or at least the property. We see no reason to suppose that the statute was intended to deprive him of that in the interest of junior holders, unless by a substitute of the most indubitable equivalence.

*Id.* at 942.

38. Commercial has not been paid since December of 1981 when its note became

due. It is not equitable to require Commercial to continue financing Development's effort to market or develop the Property when no prospect of a successful sale or other plan has been offered by Development or Pacific.

39. The Court thus finds that Development and Pacific have failed to provide adequate protection to Commercial and that the automatic stay should be lifted.

40. To the extent that the foregoing Conclusions of Law constitute Findings of Fact, they shall be so considered.

### ORDER

Now, therefore, based on the foregoing Findings of Fact and Conclusions of Law,

**IT IS HEREBY ORDERED** that the automatic stay under 11 U.S.C. § 362(a) be and is hereby terminated, vacated, lifted, and otherwise modified so as to allow the continuation of Civil No. 71594 against Development and its interest in the Property, including, but not limited to, the foreclosure sale of the Property.