49 B.R. 250 (1985)
In re Gary C. and Maureen A. REHBEIN, Debtors.
Bankruptcy No. 4-84-00499-G.
United States Bankruptcy Court, D. Massachusetts.
May 14, 1985.
Manuel Farber, Cooley, Shrair, Alpert, Labovitz & Damborv, P.C., Springfield, Mass., for debtors Rehbein.
Mikal Weiss, Vincent & Green, Northampton, Mass., for creditors Saltmarsh.
MEMORANDUM AND ORDER ON CREDITORS' OBJECTION TO DEBTOR'S MOTION TO AVOID JUDICIAL LIENS
PAUL W. GLENNON, Bankruptcy Judge.
This matter comes before the Court on creditors' objection to the debtors' motion to avoid judicial liens impairing the debtors' exemptions on their homestead property.

FACTS
A hearing was held on December 21, 1984 on Gary and Maureen Rehbein's (alternatively "Rehbein" or "Debtors") motion to avoid judicial liens that impair their *251 exemptions on their residence at 16 Jonathan Judd Circle in Southampton, Massachusetts ("homestead property"). At that hearing, creditors Donald and Linda Saltmarsh (alternatively "Saltmarsh" or "Creditors") objected to the avoidance of their judicial lien on the Debtors' homestead property in the approximate sum of $7000. The Saltmarshes claimed that the property was undervalued[1] and that their lien did not impair the Debtors' exemptions under section 522 of the Bankruptcy Code.[2] At the close of the hearing an order was entered avoiding all the judicial liens affecting the subject real estate, with the exception of the Saltmarsh lien. The motion to avoid judicial liens was continued with regard to the Saltmarsh lien, and a valuation hearing and a hearing on the continued motion were held on January 24, 1985.
At the January 24, 1985 hearing, evidence was presented as to the value of the Debtors' real estate. Numerous figures were put forth for the Court's consideration, from a low of $72,200,[3] the assessed value of the subject property as of January 1, 1985, to a high of $90,500. It was stipulated that, as of January 20, 1985, the encumbrances on the property senior to the Saltmarsh lien, plus the exemptions to which the Debtors are entitled total $85,328,[4] exclusive of attorneys' fees and costs.
Three witnesses, two for the Creditors and one for the Debtors, testified as to their opinions of the value of the property, and the Chairman of the Board of Assessors of Southampton, the town where the property is located, submitted an affidavit concerning the assessed value of the property. The relevant information gathered from these sources regarding the value of the subject property is essentially the following:
Gerald Ahern ("Ahern"), Chairman of the Board of Assessors, submitted an affidavit dated December 20, 1984 in which he stated that the property is "currently valued at $72,200," a valuation made for tax assessment purposes. Ahern believed that the valuation had been done without a view of the interior of the house and also stated that "[i]t is not uncommon in the Town of Southampton for fair market value of residential real estate to be twenty to twenty-five percent above assessed value for tax purposes." He further stated that he believed "it is likely that the fair market value . . . is in excess of eighty thousand dollars."
Robert Borawski ("Borawski"), a professional appraiser appearing as a witness for the creditors, testified that, in his opinion, the value of the property as of January 18, 1985, the date of his appraisal report,[5] is $88,000. He used a comparative sales approach and took into consideration the Debtors' unconfirmed claim that improvements to the leach field on the property are *252 necessary.[6] On his appraisal report, Borawski noted that homes in the area ranged in price from $40,000 to $125,000, with the predominant value being $80,000. He also testified that a home two doors away from the Rehbein property was under purchase and sale agreement for $108,000.[7] Borawski distinguished the $108,000 home from the Rehbein home by saying it was in somewhat better condition than the Rehbein home and had a sunporch, which the Rehbein home does not have. The Court further distinguishes the Rehbein home from the $108,000 property by the fact that the realtor's listing for the $108,000 property lists the cellar as having a "finished family room, laundry, utility room and workshop," features which are absent from the Rehbein's "unfinished" basement.
Virginia Root ("Root"), a professional appraiser brought in by the Debtors, testified that, in her opinion, the property had a fair market value as of January 17, 1985, the date of her appraisal report,[8] of $87,000. Her valuation was based on the same comparative sales approach used by Borawski and took into consideration the septic system problem. Root noted on her appraisal report that homes in the area were in the $85,000 to $130,000 range, with the predominant value being $100,000.
Adrienne Kobak ("Kobak"), a member of the Board of Assessors in Southampton and former Chairman of that Board, testified on January 24, 1985 that, in her opinion, the fair market value of the property was somewhere between $90,000 and $93,000 and settled on a value of $91,000 after subtracting $2500 for improvements to the septic system.[9] Since her highest valuation was $93,000, that figure minus the $2500 adjustment would actually make her valuation $90,500 and not $91,000.
Kobak also testified that the Town of Southampton's assessed value of $72,200 had been arrived at in 1982 and had not been re-evaluated since that time.
In addition to the numerous valuations of the Rehbein property, the Debtors' counsel observed, at the January 24, 1985 hearing, that if there were a foreclosure sale it would be likely that the property would bring in considerably less than the figures that were discussed by the witnesses. He also pointed out that a sales commission would have to be paid in the event of a foreclosure sale, and be added to the present encumbrances, exemptions and attorneys' fees and costs before any excess would be paid to the Saltmarsh lien.

DISCUSSION
There is no word used in the bankruptcy court which is more elusive than the word value.[10] It is not surprising how many different results are had when more than one person looks at a piece of real estate. The real test, of course, is when the deal is closed in connection, therewith, after a reasonable willing buyer and a reasonable willing seller, neither being under duress, have reached an agreement on price in the open market. In re Shuttleworth, 12 B.R. 27, 29 (W.D.Pa.1981). Short of the real test, determining the value of property is a difficult task, made more difficult in this case because the figures arrived at by both sides are so close.
Value is subject to fluctuations caused by market fluctuations, changes in interest rates and general economic factors. Matter of Schmidt, 36 B.R. 144, *253 146 (Bankr.N.D.Ohio 1983). In order to avoid the effect of such fluctuations, the Bankruptcy Code states, for purposes of avoiding liens which impair the bankrupt's exemptions under § 522, that the value of property is to be established as of the filing date of the petition. In re Tarrant, 19 B.R. 360 (Bankr.D.Alaska 1982). Despite this provision, there is still much inexactness in determining the rights of the parties.
The Court listens to evidence of value and must determine which appraisal figure to fix upon. In making that determination, the Court is not bound by any figure in particular, but merely guided by them all. In re Development, Inc., 36 B.R. 998, 1004 (Bankr.D.Hawaii 1984). This is because "[a]n appraisal of a property is not the result of a scientific analysis," Id. but is, rather, a subjective opinion which can and does differ from the next appraisal even though both may be based on real estate market trends.
In determining what the Rehbein property was worth on October 9, 1984, the Court utilized the following reasoning. Of the four figures that were presented for the Court's consideration, the high value of the $91,500 was eliminated as was the low value of $72,200. The high value had been testified to by a member of the Board of Assessors for Southampton, but was not substantiated by a written appraisal. Two other verbal appraisals had been supported by written reports which could be reviewed by the Court, and were, therefore, much more useful. The low of $72,200 represented the current appraisal value for tax assessment, purposes. Since the Chairman of the Board of Assessors had stated, by way of affidavit, that the $72,200 value was 20-25% lower than the current market value, the Court decided to eliminate the figure rather than adjust it upward by a purely conjectural percentage. Had the Court made such an adjustment, it would have arrived at $88,445.[11] That figure is close to the two remaining appraisals of $87,000 and $88,000 asserted by witnesses for the Debtors and Creditors respectfully, but the Court does not choose to so adjust the town's valuation figure. Instead, the Court averages the two remaining figures to arrive at a value of $87,500 as of January 17, 1985. As the Court, for purposes of § 522, needs a value for the property on October 9, 1984, exclusive of reductions for expenses or costs which might be incurred in a sale of such assets, Matter of Nellis, 12 B.R. 770, 773 (Bankr.D.Conn.1981), the $87,500 has been adjusted back to $86,186. The $86,186 figure was arrived at by reducing the January value by ½% per month. The appraisal report, prepared by Root, an appraiser for the Debtor, had utilized a ½% monthly increase as a means of adjusting values for the purposes of preparing comparative sales approach appraisals. In addition, the appraisal report prepared by Borawski, as appraiser for the Creditors, stated that the "price increase in recent months reflects continued demand and stable interest rates" (emphasis added). As no specific figure was used by Borawski to adjust for the price increase, the Court settled on ½%
When comparing the $86,186 figure to $85,328, that which is owed on the first and second mortgages through January 20, 1985 plus the Debtors' $15,800 in exemptions, it would appear that $858 remains for the Saltmarsh lien. There has been additional accrued interest, however, on the second mortgage from January 21, 1985 through May 13, 1985 which totals $1,229.44. Consequently, there remains no money to cover any portion of the Saltmarsh lien. Where the value of the unavoidable liens and the total amount of the Debtor's claimed exemptions exceeds the value of a bankrupt's property, judicial liens may be avoided to their full extent, because any payment toward such liens would impair the Debtor's exemptions. In re Duncan, 43 B.R. 833 (Bankr.D.Alaska 1984); In re Fitzgerald, 29 B.R. 41 (Bankr. E.D.Va.1983); Matter of Fiore, 27 B.R. 48 (Bankr.D.Conn.1983). It is for that reason that this Court orders that the Saltmarsh lien be avoided.

*254 ORDER
In accordance with the above, the Saltmarsh lien on the Rehbein property is avoided in full.
NOTES
[1] The Debtors' schedules listed the subject property as having an $80,000 FMV at the time of the petition filing, October 9, 1984.
[2] The Debtors' exemptions, to which the textual reference is made, are found in § 522(d) of the Bankruptcy Code. They are as follows:

"(1) The debtor's aggregate interest, not to exceed $7,500 in value, in real property . . . that the debtor . . . uses as a residence . . .
(5) The debtor's aggregate interest in any property, not to exceed in value $400 . . . "
[3] Gerald Ahern, Chairman of the Board of Assessors of Southampton, the town in which the subject property is located, submitted an affidavit dated December 20, 1984 which states that $72,200 is the current value. At the hearing, Adrienne Kobak, another member of the Board of Assessors testified that this amount was the assessed value as of January 1, 1985 as well.
[4] This figure is composed of the principal of $37,625.00 due on the first mortgage to Easthampton Savings Bank; the principal of $27,000.00 due on the second mortgage to Shawmut First Bank & Trust Co.; the accrued interest of $3,599.32 due on the second mortgage through September 20, 1984; the accrued interest of $1,304.00 due on the second mortgage for September 21, 1984 through January 20, 1985; and the $15,800.00 total exemptions on the residence to which the Debtors are entitled under Bankruptcy Code § 522.

The second mortgage continues to accrue interest at $10.88 per diem.
[5] The written appraisal report prepared by Borawski was introduced into evidence at the hearing.
[6] Borawski testified that he had deducted $2500 from his appraisal for the alleged septic system problem despite the fact that no evidence had been presented as to the nature or extent or cost of rectifying the alleged problem.
[7] A certified copy of the tax assessment record indicates an appraisal value for this property of $69,600.
[8] The written appraisal report prepared by Root was introduced into evidence at the hearing.
[9] Kobak took into consideration the same amount ($2500) that the other appraisers were using for the repair of the faulty septic system.
[10] The Bankruptcy Code defines value in § 522(a): "In this section . . . (2) `value' means fair market value as of the date of the filing of the petition."
[11] $88,445 represents a 22.5% increase over the $72,200 figure.