**In re ANDERSON OAKS (PHASE I) LIMITED PARTNERSHIP, Debtor.**

**In re ANDERSON OAKS (PHASE II) LIMITED PARTNERSHIP, Debtor.**

Bankruptcy Nos. 87–11010–11, 87–11008–11.

United States Bankruptcy Court, W.D. Texas, Austin Division.

Aug. 10, 1987.

---

**6.** *Hickman v. Taylor,* 329 U.S. 495, 67 S.Ct. 385, 91 L.Ed. 451 (1947).

Ronald King, San Antonio, Tex., for Alamo Sav.

Conde Thompson Cox, Cox & Rodnick, Austin, Tex., for debtor-appellant.

## MEMORANDUM OPINION

LEIF M. CLARK, Bankruptcy Judge.

Anderson Oaks (Phase I) Limited Partnership and Anderson Oaks (Phase II) Limited Partnership each own a phase of a two-phase apartment complex on the north side of Austin, Texas. Each phase is nearly identical in size. Alamo Savings Association ("Alamo") financed the acquisition of the properties by the current partnerships and holds a first lien mortgage on the properties. Alamo is currently owed in excess of $16 million. The partnerships fell into default and attempted to forestall foreclosure by state court injunctive proceedings. The evidence does not indicate the results of those efforts, but a bankruptcy filing followed for each of the partnerships. The state court suit alleges certain misrepresentations and other acts of bad faith on the part of Alamo and is still pending.

Almost immediately after the bankruptcy filings, Alamo filed companion motions for relief from the stay. By the agreement of the parties, the two motions were tried together. This opinion constitutes the Court's findings and conclusions in both cases.

The property in question is worth no more than $10.5 million, and may be worth less in a multi-property auction. There is thus no dispute that there is no equity in the property. The bulk of the testimony presented by the parties focused on the likelihood of an effective reorganization. Both parties placed heavy reliance upon this Court's previous decision by Judge Kelly in *In re Playa Development Corp.,* 68 B.R. 549 (Bankr.W.D.Tex.1986). Both Alamo and the Debtors presented extensively detailed cash flow analyses and future net operating income projections. Both sets of figures were derived from operational data obtained from the debtor. Those figures demonstrate that a plan of reorganization financed out of net operating income (the only apparent source of income in the case) and proposing to pay a secured claim of $10.5 million at an assumed market rate of interest (found for purposes of this hearing to be 10%) would negatively amortize for at least five years, adding over $1,000,000 of principal to Alamo's secured claim. It would be twelve years before the additional principal generated by the negative amortization would be worked off, and thirty years before the

$10.5 million secured debt would be paid off. Not until the thirteenth year would income be generated in excess of debt service to apply against Alamo's $6 million deficiency claim.

The debtors failed to submit any evidence whether there might be any creditors or parties-in-interest in this case other than the debtors and their investors, on the one hand, and Alamo on the other. In fact, the debtors' representative, when asked to testify about the shape a plan of reorganization would take, focused entirely on how a plan would refinance the claims of Alamo. According to the debtors' representative, the deficiency claim could be substantially reduced by series of offsets expected to result from the state court litigation against Alamo. The debtors' expert, who designs long range econometric models reflecting demographic patterns and population growth, focused his entire testimony on the extent to which anticipated income would be sufficient to pay off Alamo's secured claim, assuming a claim of $10.5 million. While the debtors' proposed refinancing contemplated a thirty year payout, the expert's projections ran only to the year 2000. The debtors' figures did not include a replacement reserve for replacing worn out equipment or making major repairs in the future.

■ A secured creditor seeking relief from the stay under Section 362(d)(2) bears the burden of proof only on the issue of lack of equity. *In re Playa Development Corp*, 68 B.R. 549, 553 (Bankr.W.D.Tex. 1986); *In re Irving A. Horns Farms, Inc.*, 42 B.R. 832 (Bankr.D.Ia.1984). The creditor may choose to put on evidence relating to the likelihood of an effective reorganization as well, but does not by doing so shoulder either the burden of going forward with evidence or the burden of proof on that issue. The debtor must, by the terms of the statute, carry these burdens. 11 U.S.C. § 362(g); *In re Dublin Properties*, 12 B.R. 77 (Bankr.E.D.Pa.1981); *In re Development, Inc.*, 36 B.R. 998 (Bankr.D. Hawaii 1984). In order for the debtor to sustain its burden with respect to the issue of the likelihood of an effective reorganiza-

tion, the debtor must "show the existence of a reasonable possibility that a successful rehabilitation or a successful liquidation can be accomplished within a reasonable period of time.... A reasonable probability cannot be grounded solely on speculation and the Debtor cannot meet its burden of proof through conjecture and speculation." *In re Playa Development Corp.*, 68 B.R. at 555; *In re Saypol*, 31 B.R. 796, 803 (Bankr.S.D.N.Y.1983); *In re St. Peter's School*, 16 B.R. 404, 408 (Bankr.S.D.N.Y. 1982). The court should not, at the conclusion of the debtor's case, be left to speculate about important elements and issues relating to the likelihood of an effective reorganization. *In re Playa Development Corp.*, 68 B.R. at 556.

■ The *Playa* decision, together with both its predecessors and its progeny, correctly notes the importance of focusing on the "effectiveness" of any proposed rehabilitation. On that test alone, the debtors have failed to meet their burden. Their proposal forces the secured creditor first to write down its secured debt from $16 million to $10.5 million, then to involuntarily refinance that $10.5 million. That much is contemplated under the Bankruptcy Code. However, the Debtors acknowledge that the plan will not work unless, in addition, the secured creditor is compelled to accept negative amortization, the net effect of which is to increase the debt, forcing a post-confirmation loan out of Alamo. The scenario would still leave some $6 million in unsecured debt to Alamo to go begging. The net effect of the Debtors' proposal is to delay any payment on claims for at least five years. Not until twelve years after confirmation would the level of debt return to where it was on the date of confirmation. While negative amortization might not in and of itself be fatal to confirmation of a plan, it is surely fatal in this case. *See In re Murel Holding*, 75 F.2d 941 (2d Cir. 1935); *see also In re Saypol*, 31 B.R. 796, 802 (Bankr.S.D.N.Y.1983) ("Stretching out payment to a secured creditor over ten years pursuant to a plan in preference to junior interest [such as equity interest holders] entails far greater uncertainty

than staying a secured creditor ... during the pendency of the proceeding.")

The proposal would also fail the feasibility test of Section 1129(a)(11). The Debtors' proposal would shift virtually all risk of failure onto the secured creditor. In order for this plan to work without perpetrating a monstrous injustice on Alamo, Debtors would have to virtually guarantee their projections for at least twelve years, as Alamo's principal would remain unamortized for at least that long. This, of course, Debtors cannot do, nor will this Court. Considering the substantial risk of loss that Alamo would have to bear during that period as compared to the Debtors, the Court is compelled to be very cautious indeed when it comes to speculating about the future.

Debtors place reliance on testimony to the effect that the property will "surely be worth" $16 million in ten years, suggesting that therefore Alamo will actually be gaining ground during the term of the plan. Even if this property could be sold for that much in ten years, however (and this Court feels that to make such a finding again calls for too much speculation), that fact would offer no comfort to Alamo (or the Court, for that matter), as the present value of $16 million received in ten years (assuming a discount factor of 10%), is only $5.9 million. The Debtors' proposal, in the view of the Court, is not feasible, and therefore fails to satisfy the Court that an effective reorganization is possible.

The real failure here is not in the proper presentation of the facts, but rather in the lack of proper facts to present. Thus, though this Court might normally be reluctant to "pull the plug" so early in a case, where the determinative facts which would shape a plan are not going to change, the greater injustice is to allow the case to remain on the docket, serving no purpose but to temporarily shelter the Debtors from the inevitable. In order for there to be an effective reorganization, reorganization itself must be a possibility. Where it appears from the evidence that no proposed plan could realistically surmount the obligations imposed by Section 1129(a), it follows that no effective *reorganization* is possible. Of course it is neither possible nor appropriate to convert stay litigation into a full-blown confirmation hearing. *In re Island Helicopter Corp.*, 63 B.R. 809, 815 (Bankr.E.D.N.Y.1986). However, where it appears that the proposed arrangement cannot be effected as a matter of law, then it would be equally unwise to permit the case to proceed any further. For better or worse, Debtors premised their case on their ability to force an involuntary refinancing upon an unwilling secured lender. Having done so, it was incumbent upon them to demonstrate that they could, as a matter of law, reach cramdown under Section 1129(b) of the Code. This Debtors failed to do.

To achieve effective reorganization by way of a cramdown plan, there must be at least one impaired class of creditors, not including insiders who vote for the plan. *In re Distrigas Corp.*, 66 B.R. 382, 382 (Bankr.D.Mass.1986); 11 U.S.C. § 1129(a)(10). The Debtors failed to put on any evidence that such a class exists. To the contrary, the testimony indicates that there is no such creditor class available in this case. The reasonable inference to be drawn from the testimony adduced at the hearing is that there are no other creditors in this case. In any event, in view of the nature of reorganization being proposed by the Debtors, it was incumbent upon the Debtors, as part of their burden of proof, to come forward with evidence of the existence of a class of noninsider creditors other than Alamo available to satisfy the requirements of Section 1129(a)(10). *See In re Development, Inc.*, 36 B.R. 998, 1006 (Bankr.D.Hawaii 1984).[1] The Court is not

---

1. The bankruptcy court there noted that

   In failing to present any evidence to show that there exists a realistic prospect for a successful reorganization or for the development or sale of the property within a reasonable time, [Debtors] have utterly failed to meet their

   burden of establishing that the Property is necessary for an effective reorganization

   *Id.* The Court is not required to "fill in the blanks" left by the party bearing the burden of proof, nor is it compelled to indulge presumptions not otherwise raised by the statute or case

obligated to presume the existence of other creditors simply because this is a bankruptcy case. If anything, the reasonable presumption in an apartment complex bankruptcy case is that there are no other creditors—only the debtor and its lender.

■ The fact that the lender itself might decide after all to accede to a refinancing, thereby satisfying Section 1129(a)(10), simply misses the point. Two-party disputes such as this simply have no place in bankruptcy. *In re Landmark Capital Company,* 27 B.R. 273, 281 (Bankr.D.Ariz.1983); *Matter of Gilbert Broadcasting Corp.,* 54 B.R. 2, 4 (Bankr.D.N.J.1984); *Matter of Volpe,* 53 B.R. 46, 48 (Bankr.M.D.Fla.1985); *see generally,* T. Jackson, *The Logic and Limits of Bankruptcy Law* (Harvard University Press 1986).[2] Allowing the dispute to be resolved in bankruptcy confers unwarranted leverage in favor of the Debtors, without the attendant equities that normally justify that leverage. Many courts have found that such filings violate the "good faith" prerequisite to invoking the bankruptcy court's equitable jurisdiction. *See Landmark Capital Company, supra; Matter of Volpe, supra; Matter of Roy Dawson Radio Corp., Inc.,* 70 B.R. 588, 591 (Bankr.M.D.Fla.1987). In the *Landmark Capital* case, the court found that the debtor had filed its petition for the sole purpose of preventing the secured lender from exercising its mortgage rights. There were no substantial unsecured credi-

tors, other than the movant, and the court determined that the proceeding was in effect a two party dispute between the debtor and the movant which should be settled outside the jurisdiction of the bankruptcy court. The court then held that the debtor's conduct was inconsistent with the purpose, spirit, and intent of Chapter 11. *Landmark Capital Company, supra* at 279–280; *accord Matter of Roy Dawson Radio Corp., Inc.* at 591.[3] This Court cannot find that an effective reorganization is possible when such a reorganization would be premised on the improper invocation of this Court's jurisdiction in the first place.

Here, boiled down to its essence, is an attempt by an investor group to use the Bankruptcy Code as a device with which to force its lender into renegotiating their loan. It is true that Section 506 does contemplate limiting a secured claim to the value of the collateral securing the claim. It is equally true that Section 1129(b) contemplates forcing an involuntary loan upon recalcitrant creditors in order to attain confirmation of a plan. It is not true, however, that those provisions are available to any investor looking to refinance his loan. The requirement of at least one impaired class of creditors who have affirmatively voted for the plan *and who are not insiders* must be met in order to invoke the "cram-down" provisions of Section 1129(b). In short, there must be some one other than the debtor, other than the insiders,

---

law. If anything, the failure to produce evidence on the existence of other creditors in the case whose interests should be taken into account may fairly raise the inference that there are no such creditors:

> The nonproduction of evidence that would naturally have been produced by an honest and therefore fearless claimant permits the inference that its *tenor is unfavorable to the party's cause.* Ever since the case of the Chimney Sweeper's Jewel, this has been a recognized principle.

2 Wigmore, Evidence § 285 at p. 192 (Chadbourne rev. 1979) (emphasis in original).

**2.** Jackson notes that bankruptcy is primarily a debt collection remedy invoked when individual creditor remedies prove counterproductive in the context of multiple creditor claims:

> ... there are, indeed, occasions when a collective system of debt-collection law might be

preferable. Bankruptcy provides that system. The single most fruitful way to think about bankruptcy is to see it as ameliorating a common pool problem created by a system of individual creditor remedies. Bankruptcy provides a way to override the creditors' pursuit of their own remedies and to make them work together.

*Id.* at 16–17. The common pool problem does not arise when there is only one creditor seeking recovery from the pool.

**3.** In this case, Debtors still have a variety of remedies available to them in state court. In fact, there is already litigation pending against Alamo by the Debtors in state court, alleging various misrepresentations and breaches. The evidence strongly suggests that the real battle between the parties is joined in that litigation anyway. No prejudice results from being deprived of this forum (other than the "prejudice" of being deprived of an unfair advantage).

and other than the target of the cram down, who cares enough about the reorganization and whose rights must also be considered to invoke the equitable grounds that justify resort to cram down. If cramdown is not available, it is pointless to further consider a plan which requires cramdown for its success. Because the reorganization which these Debtors contemplate is not possible, it follows as a matter of logic that the Debtors have failed to carry their burden that an effective reorganization is possible.

Having found that the debtor has failed to carry its burden of proof to establish the likelihood of an effective reorganization, the motion of Alamo will be granted. An Order granting Alamo relief from the stay will be entered accordingly.