EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION,
Plaintiff,

v.

FOSTORIA RESTAURANTS,
INC., etc., Defendant.

No. 3:97CV 7225.

United States District Court,
N.D. Ohio,
Western Division.

July 22, 1998.

Solvita A. McMillan, Howard R. Besser, E.E.O.C., Cleveland, OH, for Plaintiff.

Richard Kevin Greenfield, Nathan & Roberts, Toledo, OH, for Defendant.

## MEMORANDUM OPINION

KATZ, District Judge.

This matter is before the Court on cross motions for summary judgment, and on Defendant's motion to strike certain exhibits. For the following reasons, the Court will find that a triable issue of fact exists on whether Defendant violated Title VII of the Civil Rights Act of 1964, and will deny both summary judgment motions. Defendant's motion to strike will be granted in part and denied in part.

### I. BACKGROUND

Few of the relevant facts are in dispute. This suit arose out of the discipline and subsequent termination of complainant Deborah Hendricks from her employment as an assistant manager at a Fostoria, Ohio Taco Bell restaurant owned and operated by the Defendant corporation.

Hendricks was hired as an assistant manager of the Taco Bell in question on October 13, 1993. In the fall of 1994, Tom Fees became the manager of that Taco Bell, and Hendricks' immediate supervisor. Fees reported to Director of Operations Donald Unruh, who supervised about a dozen Taco Bell restaurants in the area.

From the time of her hire until the date of her final semi-annual performance evaluation on March 14, 1995, Hendricks consistently received high ratings from her supervisors.

On February 21, 1995, Hendricks complained to Unruh that Fees was engaging in inappropriate sexual conduct in the workplace. It appears from the record that the conduct consisted primarily of sexual jokes and comments, along with some inappropriate touching. Unruh conducted an investigation of Hendricks' complaints, in which he interviewed Fees and six other individuals. As a result of that investigation, Fees was given a written reprimand and a one-day suspension without pay. Fees was instructed not to retaliate against Hendricks or the other employees.

Almost immediately after his suspension, Fees informed managerial employees at the Taco Bell that all rules and regulations would thereafter be enforced to the letter. Prior to that time, enforcement had not been strict.

On March 23, 1995, Hendricks called in sick approximately two hours and forty-five minutes before she was scheduled to begin her shift. Taco Bell has a policy requiring sick employees to call in at least three hours before they are scheduled to work. Fees issued Hendricks a written warning for failing to call in three hours before her scheduled shift. That warning was the only disciplinary action Hendricks received during her employment for Defendant. Other employees had failed to meet the three-hour deadline on previous occasions, but none had ever been disciplined.

The Fostoria Taco Bell has a "Manager's Log," in which the day and night shift managers leave daily handwritten communications to each other. On July 11, 1995, Hendricks wrote the following note to the day shift managers:

Could you *Please* show the clean-up crew how to roll up the hoses properly instead of just *throwing* them in the *corner* for someone else to straighten up. If EVERYONE would do their part *this store* would not be such a pig sty.

Does everyone know how to cut down boxes & organize the stock room?? It sure has been messy this past month! I decided till I seen effort on another shift I was Not going to be the only one to clean this store up! Lets see how long it takes to trash it again.

Day shift manager Ryan Cantu responded as follows the next day:

When I left last night there were not hardly any boxes I had Misty take them out as for the trash when I was going to do the trash we got a little busy I'm in the position where I have to *defend* myself always. I do have to stick up for myself. I also clean as best as I can you use to always say I'm a good mgr. but you give me the impression I'm no good. I don't pick on every little thing you do wrong.

Hendricks responded by writing in the log: "Until you become my Boss you have NO grounds to ever think you can tell me how to do my job!!" Hendricks also wrote "whaa whaa whaa" in the margin next to Cantu's entry.

On July 13, 1995, Fees blacked out the "whaa whaa whaa" comment and directed the following log entry at both Hendricks and Cantu:

This is not to be used as a complaint book, this is a communication log book.

Ryan, I didn't see anything in Deb's notes about you not taking trash out, she was explaining why there were 200 lbs of boxes in the back Wed. morning, because they (the closers & Deb) took the time to restock and arrange the restaurant & walk-in which should have been done Sunday when the truck was in. That is another issue that has been corrected.

Deb, your or whoever wrote the comment in the margin of Ryan's note is entirely unproffessional and unacceptable and will not be tolerated. That is why I crossed it out.

Also I don't see anywhere that Ryan is telling you how to do your job.

In late July of 1995, while Hendricks was on vacation, Fees instituted a policy of using mandatory opening and closing checklists to identify problem areas. On August 4, 1995, Fees filled out a checklist that noted three unsatisfactory aspects of Hendricks' close the previous evening: shoe marks on the walls, fingerprints on the doors, and dirty shelves in the drive-thru area. Hendricks admits the criticisms were factually accurate.

On August 5, 1995, Hendricks wrote the following private letter to Fees, complaining about the checklist:

As for the checklist, Friday night the place looked good. Nate worked his butt off scrubbing lobby. In fact it was the cleanest I'd seen it in a long time. I told Nate what you felt he didn't do properly and told Shawn about the marks on the shelf on D/T. Shawn said he doesn't even put his feet up on those shelves which means those marks came from days.

I really can't believe that you would even be that pettish to point those things out. We worked very hard only to be degraded on the things we did. If you feel you can do better than do it. If *you* feel you can find better closers & managers then do that also. I took your note as an insult and I did my job properly and dont feel I have to put up with your little remarks!! *Shoemarks* for God sakes. *How many times has a manager left the store with the safe unlocked, *the alarm not* on, meat left in the thermalater, food left on the fridge on line, carry over put away wrong so it spoiled. And you want to complain about shoemarks! Ha!! Ha!! I gave Nate the checklist & he marked them off as he did them. He took about 15 minutes just scrubbing the high chair & booster seats. I looked it over & though it looked great.

I dont understand the sudden change. Before I went on Vacation all I did was bitch cause NO ONE would clean properly. I was the most adamant about cleaning. And now *you* are gonna tell me I didnt do my job properly. When the world becomes perfect then I guess I will except thats how I have to be But until then I'll do my job to the best of my ability & if that isnt good enough then hire someone *better* to replace me!

I could of understood & accepted a note or write up if I had done something wrong like leave food out or not turn on the alarm but I have a hard time being nit-picked at!

On August 6, 1995, Fees showed Hendricks' letter to Unruh, and recommended that Hendricks be terminated for "blatant unprofessional conduct." Unruh terminated Hendricks, effective August 9, 1995, without investigating the matter further. The record does not indicate any other occasion on which an employee was terminated for blatant unprofessional conduct, and several deponents have stated that they cannot remember any other such termination during the past several years.

Fees discontinued using the mandatory checklists on August 10, 1995. Thereafter, use of the checklists became optional.

During and after the time Hendricks managed the Taco Bell, there were occasions when employees other than Hendricks engaged in unprofessional conduct. Shift manager Randy Banks has submitted a sworn declaration in which he states that he once left food in the thermolator overnight, once left items in the refrigerator under the line overnight, once left the doors unlocked all night, once forgot to set the alarm, once failed to clock out, and was sexually involved with a co-worker, all in violation of company rules. He was written up for most, but not all, of the aforementioned offenses, and was suspended for dating the co-worker. No other disciplinary action was taken against him.

Shift manager Rhonda Morrow was sexually involved with two co-workers in violation of company rules, and was not disciplined.

Crew member Melanie Dible hit another employee on one occasion and was not terminated; the record does not reflect whether she was disciplined. On February 18, 1995, Dible argued with Hendricks, screaming profanity at her, in front of several customers. Hendricks requested that Dible be terminated for insubordination as a consequence. Fees rejected that request. Dible was suspended, and voluntarily resigned five weeks later.

Fees was accused of sexual harassment on two occasions. On the first occasion, described above, Unruh conducted a week-long investigation, interviewed six people who all confirmed the complainant's story, and suspended Fees for one day. The second accusation of sexual harassment came on March 12, 1997, when two high-school students who were working at the Taco Bell complained to a schoolteacher that Fees had behaved inap-

propriately. Unruh responded to the accusations by interviewing Fees, a number of employees, the high-school students, and the teacher, and then by seeking legal advice from both the EEOC and outside counsel. Fees was permitted voluntarily to resign, effective April 1, 1997.

After her termination, Hendricks filed a discrimination charge with the EEOC, claiming that Defendant had terminated her in retaliation for the sex harassment charge she made against Fees. The EEOC, after an investigation, brought this suit, claiming that Defendant deprived Hendricks of equal employment opportunities in retaliation for her opposition to practices made unlawful by Title VII of the Civil Rights Act of 1964. The EEOC requests an injunction against further retaliatory practices and an order requiring Defendant to establish programs to eradicate the effects of any such practices; an order requiring Defendant to make Hendricks whole by providing her compensatory and punitive damages and such equitable relief as may be necessary; and the costs of bringing this action. Both sides have filed motions for summary judgment on the issue of liability. The Court discusses the parties' contentions below.

## II. Motion to Strike

Defendant has moved to strike certain portions of Plaintiffs' proffered evidence. The admissibility of that evidence must be determined as a threshold issue, because the Court bases its summary judgment decision on the admissible evidence in the record. *See* Fed.R.Civ.P. 56(c) & (e). Defendant objects to the following:

● *Exhibit 42—Letter from Lynn Fees*

Defendant objects that the letter is neither properly sworn nor authenticated. The Court finds that the letter must be stricken, although for a different reason than that propounded by Defendant. The letter contains no information which is properly admissible to prove anything relevant in this case. Therefore, the matter contained therein must be disregarded.

● *Exhibit 43—Memorandum Written and Signed by Thomas Fees*

■ Defendant objects that the memorandum cannot be admitted as an affidavit because is neither properly sworn nor authenticated. Defendant's argument lacks merit. Although the letter is not admissible as an *affidavit*, admissible evidence consists of many things other than affidavits. The letter is competent demonstrative evidence arising out of the EEOC investigation in this matter. Furthermore, the matter contained therein is admissible as nonhearsay to prove the truth of the matter asserted therein, pursuant to Fed.R.Evid. 801(d)(2)(C) & (D). That memorandum is admissible.

● *Exhibit 44—Affidavit of Thomas Fees*

■ Defendant objects that the affidavit cannot be admitted because it is neither properly sworn nor authenticated. Defendant's argument lacks merit. The document at issue is signed, under penalty of perjury, by Fees, and is initialed by him on each page. *See* 28 U.S.C. § 1746. Furthermore, the matter contained therein is admissible as nonhearsay to prove the truth of the matter asserted therein, pursuant to Fed.R.Evid. 801(d)(2)(C) & (D). That affidavit is admissible.

● *Exhibit 45—Affidavit of Donald Unruh*

Defendant objects that the affidavit cannot be admitted because is neither properly sworn nor authenticated. Defendant's argument lacks merit. The document at issue is signed, under penalty of perjury, by Unruh, and is initialed by him on each page. Furthermore, the matter contained therein is admissible as nonhearsay to prove the truth of the matter asserted therein, pursuant to Fed.R.Evid. 801(d)(2)(C) & (D). That affidavit is admissible.

● *Exhibit 46—Affidavit of Ryan Cantu*

Defendant objects that the affidavit cannot be admitted because is neither properly sworn nor authenticated. Defendant's argument lacks merit. The document at issue is signed, under penalty of perjury, by Cantu, and is initialed by him on each page. Furthermore, the matter contained therein is

admissible as nonhearsay to prove the truth of the matter asserted therein, pursuant to Fed.R.Evid. 801(d)(2)(D). That affidavit is admissible.

● *Exhibit 47—Affidavit of Rhonda Morrow*

Defendant objects that the affidavit cannot be admitted because is neither properly sworn nor authenticated. Defendant's argument lacks merit. The document at issue is signed, under penalty of perjury, by Morrow, and is initialed by her on each page. Furthermore, the matter contained therein is admissible as nonhearsay to prove the truth of the matter asserted therein, pursuant to Fed.R.Evid. 801(d)(2)(D). That affidavit is admissible.

● *Exhibit 48—Affidavit of Randy Banks*

Defendant objects that the affidavit cannot be admitted because is neither properly sworn nor authenticated. Defendant's argument lacks merit. The document at issue is signed, under penalty of perjury, by Banks. Some of the matter contained in the Banks affidavit is inadmissible hearsay, however, and must be disregarded. The portions of the affidavit in which Banks testifies from personal knowledge are admissible.

● *Declaration of EEOC Investigator Lynn Gagyi*

Defendant objects that the declaration cannot be admitted because it is neither properly sworn nor authenticated. Defendant's argument lacks merit. The document at issue is signed, under penalty of perjury, by Gagyi. Some of the matter contained in the Gagyi affidavit is inadmissible hearsay, however, and must be disregarded. The portions of the affidavit in which Gagyi testifies from personal knowledge are admissible, as are the portions of the affidavit that are based on statements from Defendant's employees, pursuant to Fed.R.Evid. 801(d)(2)(C) & (D).

● *Declaration of Teresa Personen*

Defendant objects that the declaration cannot be admitted because is neither properly sworn nor authenticated. Defendant's argument lacks merit. The document at issue is signed, under penalty of perjury, by Personen. That declaration is admissible.

## III. MOTIONS FOR SUMMARY JUDGMENT

### A. Summary Judgment Standard

As an initial matter, the Court sets forth the relative burdens of the parties once a motion for summary judgment is made. Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). Of course, the moving party always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact. *Id.* at 323, 106 S.Ct. at 2553. The burden then shifts to the nonmoving party who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986) (*quoting* Fed.R.Civ.P. 56(e)).

Once the burden of production has so shifted, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations. It is not sufficient "simply [to] show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). Rather, Rule 56(e) "requires the nonmoving party to go beyond the [unverified] pleadings" and present some type of evidentiary material in support of its position. *Celotex*, 477 U.S. at 324, 106 S.Ct. at 2553. Summary judgment shall be rendered if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c).

## B. Retaliation for Opposing Practices Made Unlawful by Title VII

Title VII of the Civil Rights Act of 1964 prohibits an employer from discriminating against any employee "because he has opposed any practice made an unlawful employment practice by [Title VII], or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]." 42 U.S.C. § 2000e–3(a). A plaintiff establishes a prima facie case of retaliation by showing:

(1) that she engaged in an activity protected by Title VII;

(2) that the defendant knew of the plaintiff's exercise of her civil rights;

(3) that, thereafter, the defendant took an employment action adverse to the plaintiff; and

(4) that there was a causal connection between the protected activity and the adverse employment action.

*Harrison v. Metro. Gov't of Nashville & Davidson County, Tenn.,* 80 F.3d 1107, 1118 (6th Cir.), *cert. denied,* — U.S. ——, 117 S.Ct. 169, 136 L.Ed.2d 111 (1996); *Christopher v. Stouder Memorial Hosp.,* 936 F.2d 870, 877 (6th Cir.1991); *Wrenn v. Gould,* 808 F.2d 493, 500 (6th Cir.1987). Once the plaintiff establishes a prima facie case of retaliation, the burden of production then shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its actions. *Canitia v. Yellow Freight Sys., Inc.,* 903 F.2d 1064, 1066 (6th Cir.1990). The burden then shifts back to the plaintiff to demonstrate that the proffered reason is a pretext. *Id.*

The parties agree that Hendricks meets the first three prongs of the test: she engaged in an activity protected by Title VII; Defendant knew of Hendricks' exercise of her civil rights; and Hendricks was thereafter disciplined and terminated. The parties disagree about whether Hendricks meets the fourth prong: whether a reasonable jury could find that there was a causal connection between Hendricks' allegations of sexual harassment and her termination. Defendant argues that no reasonable jury could find that such causal connection exists. The EEOC argues that the evidence of a nexus is so one-sided that a reasonable jury *must* find the necessary causal connection.

█ The Court finds that a triable issue of fact exists on the question of nexus, and that the matter must, therefore, be submitted to the trier of fact for determination. On the one hand, there is more than a scintilla of evidence that Defendant's purported reason for terminating Hendricks—the insubordinate letter—is a pretext for retaliation. Hendricks was terminated within six months of complaining about Fees' behavior, and the chain of events that led to Hendricks' termination arguably began less than a month after her complaints. There is substantial evidence that other employees who violated Taco Bell policy, both as to late call-ins for absences and as to professional behaviour, were treated more leniently than was Hendricks. Hendricks was terminated for writing a private letter, albeit an unprofessional one, to a supervisor. Other employees received warnings or no discipline at all for serious infractions, including sexual harassment, screaming profanity in the presence of customers, leaving food items where they would spoil, leaving doors unlocked, and failing to set the alarm. A reasonable jury could find for Plaintiff.

On the other hand, there is also more than a scintilla of evidence that Defendant's purported reason for terminating Hendricks was legitimate. Hendricks herself acknowledges that the letter she wrote Fees was unprofessional. She had been warned approximately a month previously that unprofessional behavior would not be tolerated. A reasonable jury could find for Defendant.

## IV. CONCLUSION

For the foregoing reasons, there is a triable issue of fact on whether Defendant retaliated against Hendricks by disciplining and terminating her. The matter, therefore, must be presented to a finder of fact. Both motions for summary judgment are denied.

IT IS SO ORDERED.