RAYMOND WALLER and Wife, PANSY WALLER, Complainants-Appellees, v. A. E. HODGES and C. L. BAILEY, Defendants-Appellees. —321 S. W. (2d) 265.

Western Section. July 29, 1958.

Certiorari denied by Supreme Court December 12, 1958.

James D. Causey, William H. Williams, Memphis, for appellant Hodges.

Shields & Levit, Memphis, for appellant Bailey.

F. C. Sewell, Memphis, for appellees.

CARNEY, J.   The defendants below, A. E. Hodges and C. L. Bailey, appeal from a decree of the Chancellor sustaining the original bill of the complainants, Raymond Waller and Pansy Waller.  The Chancellor held that the defendants, A. E. Hodges and C. L. Bailey, had over-reached and practiced a fraud upon the complainants, Raymond Waller and Pansy Waller, in obtaining the execution of a contract to build a duplex dwelling at a price of $10,250.  The contract was ordered rescinded and certain promissory notes and deeds of trust securing the same cancelled.

Raymond Waller and his wife, Pansy Waller, are colored.   Raymond is employed as a delivery boy for Green's Pharmacy in Memphis, Tennessee, and Pansy Waller is employed as a domestic servant working a part of each week for Mrs. R. S. McGee and another part of each week for Mrs. Frank Lyons.

Pansy is 57 years old and she does not know the age of her husband, Raymond Waller.  We do not believe his age is shown in the record.  The parties can read and write but have had very little business experience.

Pansy Waller had purchased a frame dwelling at 494 Carpenter Street in Memphis, Tennessee, prior to her

marriage to Raymond Waller in 1942. Raymond and Pansy occupied this dwelling as their residence at the time of the trial. This real estate is also identified in the record as lots 58 and 59 Carpenter and Guthrie Re-subdivision.

At the time they dealt with defendants, Hodges and Bailey, Pansy Waller owed a balance of approximately $500 secured by a first mortgage or deed of trust on said home place. Adjacent to said property she and Raymond owned jointly a vacant lot identified in the record as lots 56 and 57 of Carpenter and Guthrie Re-subdivision. This vacant lot was unencumbered.

On or about March 4, 1957, the defendant, A. E. Hodges, along with a Notary Public, went to the home of Raymond and Pansy Waller and had them sign, among other documents, a contract whereby the Hodges Construction Company agreed to build a new brick veneer duplex dwelling size 26 by 34 feet with three rooms and full bath on each side and to paint the outside of the Pansy Waller dwelling house at 494 Carpenter at a total price of $10,250.

Two pertinent paragraphs from the contract are as follows:

"In consideration of the above work and payments enumerated, parties of the first part agree to pay to the party of the second part the total sum of $10,-250.00 with interest at the rate of 6% and payable by monthly installments of $81.45 per month, amortized and secured by a first mortgage Trust Deed on the hereinafter described property. Said payments are to begin on May 1, 1957.

"It is understood that the parties of the first part will execute the above described mortgage in the sum of $10,250.00 with interest at the rate of 6% per annum and payable by monthly installments of $81.45 monthly and turn same over to the party of the second part to sell, mortgage, convey, or hold or negotiate in any way that he sees fit as long as the above work is carried out and this contract complied with as this Trust Deed will become his property when turned over to him."

The contract contained no further description of the property to be included within the mortgage.

At the same time this contract was executed by Raymond and Pansy Waller, they also executed two separate notes and deeds of trust securing them on two separate pieces of property.

The first note was in the amount of $3,600 drawing interest at 6% per annum from date payable to bearer at the rate of $36.50 per month beginning May 1, 1957, and a like amount on the first of each month thereafter through March 1, 1964, with all the remainder of the principal and interest falling due on April 1, 1964. This note was secured by a deed of trust on Pansy Waller's home place located at 494 Carpenter and being lots 58 and 59 of Carpenter and Guthrie Re-subdivision.

The second note was in the amount of $6,650 drawing interest at 6% per annum from date payable to the order of bearer at the rate of $44.95 per month beginning May 1, 1957, and a like amount on the first day of each month thereafter through March 1, 1967. The remainder of the principal and interest became due and payable on April 1, 1967. This note was secured by a deed of trust of

Raymond Waller and wife on the vacant lot known as lots 56 and 57 Carpenter and Guthrie Re-subdivision on which was to be built the brick duplex.

Both deeds of trust were filed for registration in the Register's office of Shelby County, Tennessee, on March 13, 1957. They bore date March 4, 1957, and the acknowledgement of Mrs. Jean Sherrill, Notary Public, recited that the deeds of trust were executed on March 4, 1957. Raymond Waller and wife, Pansy, also signed, at the request of defendant Hodges, the following agreement:

"March 4, 1957

Agreement

"We, Raymond Waller and wife, Pansy Waller, hereby acknowledge signing a Trust Deed, Note, Owner's Affidavit, Owner's Agreement and a Contract for the Hodges Construction Company in order that they can arrange a loan on our property known as 494 Carpenter Street (Lot No. 58 and 59) and Lots No. 56 and 57 in the Carpenter Subdivision, Memphis, Tennessee. We further certify that all of the papers were completely filled in and we acknowledge signing them in good faith. We further authorize the Hodges Construction Co. to disburse the proceeds from this loan. We further state that we clearly understand that we have executed a first mortgage on our property dated March 4, 1957, at the sum of $10,250.00 with interest at the rate of six per cent per annum and payable $81.45 monthly. This mortgage was turned over to the Hodges Construction Co. and they have complete authority from us to do whatever they want with the said mortgage, which includes selling, hold for collection, or dispose of same in any way that they see fit.

"We again state that we are completely satisfied and everyone involved is relieved of any further responsibility to us whatsoever.

"/s/ X Raymond Waller

/s/ X Pansy Waller

"State of Tennessee, County of Shelby

"On this 4 day of March, 1957, before me, a Notary Public in and for said State and County, duly commissioned and qualified, personally appeared Raymond Waller and Wife, Pansy Waller (Pansy Waller is one and the same person as Pansy Casulay and Pansy Casway) to me known to be the persons described in and who executed the foregoing instrument, and acknowledged that they executed the same as their free act and deed.

"Witness my hand and Notarial Seal at office the day and year above written.

"My commission expires: My Commission expires

April 14, 1959.

"/s/ Jean Sherrill

Notary Public"

On or about March 13, 1957, the defendant, C. L. Bailey, who had never had any negotiations directly with Raymond and Pansy Waller began construction work on the duplex under the terms of the contract.

On or about April 5, 1957, the complainants filed their present bill in this cause alleging that they had been defrauded in two respects: that the purchase price of the

duplex was to be only $8,000 instead of $10,250 and that second, the defendant Hodges had agreed to build said duplex without any money down and to take as security for the cost of construction of said duplex only a deed of trust on the two lots upon which the duplex was to be built; and that it was expressly understood that Pansy Waller's home place was not to be involved in the contract and not to be encumbered in any manner for the payment of said construction cost.

An injunction was issued restricting the defendant, Bailey, from proceeding further on the construction pending the trial.

Upon the trial Raymond and Pansy testified that Raymond had been approached by Mr. Hodges sometime prior to March 4, 1957, first to buy the vacant lot and second to permit Mr. Hodges to build the duplex on said lot for him. They testified that Mr. Hodges first told Raymond that the cost of the duplex would be $7,000 but that on the night of March 4, 1957, Mr. Hodges explained that the total construction cost would be $8,000 instead of $7,000.

Pansy Waller had not discussed the matter with Mr. Hodges before that night and they testified that they both signed the papers submitted by Mr. Hodges with the express understanding that the contract was to be $8,000 and that Pansy Waller's home place was not to be encumbered. They also testified that Mr. Hodges kept maneuvering the papers all the time they were being signed so that they could not read them and that Mr. Hodges promised to give them at a later date a copy of the papers they were signing.

Further they testified that if there was a Notary Public present they did not know it but that Mr. Hodges did have two women and a child with him at the time of the signing.

They further said that Mr. Hodges told them that the duplex would bring in enough to pay the monthly payments on the note with a very small margin over and that after ten years they would have their duplex paid for out of the rentals.

Upon the trial they reiterated that they were still willing to pay Mr. Hodges $8,000 for the duplex if they could get it financed solely by a trust on the duplex and lot without including Pansy Waller's home place. A colored man named Keys, a carpenter, testified as a witness for complainants that he could and would be willing to build the duplex at a cost of $6,000.

The defendant Hodges testified that the parties fully understood the transaction; that they fully understood that one of the ladies whom he brought with him on March 4, 1957, to sign the papers was Mrs. Jean Sherrill, a Notary Public, one of his neighbors; that no fraud was practiced in any manner upon these two parties and that they fully understood the cost price of the duplex and and that both pieces of property were being given in trust as security for the cost price of the duplex. Further Mr. Hodges testified that he first intended to build the duplex himself but was unable to get proper financing and therefore he sold the contract including the deeds of trust and notes to the co-defendant, Mr. C. L. Bailey, who started construction under the terms of the contract, and that he, Hodges, had no further interest in the contract whatsoever.

The defendant Bailey testified that he had never had any conversation with the complainants, Raymond Waller and Pansy Waller, prior to the time he began work and that he had only seen the property one time when he drove by prior to March 4, 1957, and gave Mr. Hodges an estimate as to the cost of the duplex; that he purchased the contract, notes, etc., from Mr. Hodges at a price of $400 and began work on or about March 13, 1957.

A Mr. J. P. Houston, employee of the Crown Coal & Lumber Company, corroborated Mr. Hodges to the effect that Raymond and Pansy fully understood the terms of the contract, deeds of trust, etc. Mr. Houston testified that shortly after March 4, 1957, Mr. Hodges sought to have him, Houston, or the lumber company furnish the materials for the construction of the duplex and that he, Houston, had in his possession the deeds of trust, contracts, etc. and discussed the terms thereof with Raymond Waller.

Further he testified that he left the deeds of trust, contracts, etc., in the possession of Raymond Waller for a period of approximately twenty-four hours in order to permit Raymond to discuss the terms with his employer, Mr. Green. Mr. Houston said that his firm decided not to handle the transaction and he did not purchase the contract and notes from Mr. Hodges nor did he furnish any materials to Mr. Hodges.

Mrs. Jean Sherrill, the Notary Public, corroborated the testimony of Mr. Hodges to the effect that she was personally present with Mr. Hodges at the time the papers were all signed and that both Raymond and Pansy fully understood the terms of all of these different documents and fully understood the contract price and

that the different pieces of property were to be encumbered.

The Chancellor who saw and observed the witness upon the stand found the issues in favor of the complainants and against the defendants and ordered a rescission of the contract and cancellation of the notes and deeds of trust.

On May 23, 1958, the defendant, C. L. Bailey, filed his brief and argument along with seven assignments of error. The substance of these assignments of error is that the Chancellor erroneously found that the allegations of complainants' bill were sustained by the proof and that therefore he erroneously awarded the relief sought by complainants' bill against the defendants.

On May 24, 1958, the defendant, A. E. Hodges, filed his brief in this court in which he adopted the assignments of error made by C. L. Bailey. They are represented by separate counsel on this appeal.

The case having been tried by the Chancellor below without a jury, comes to this court on appeal for a hearing de novo accompanied by a presumption of the correctness of the judgment or decree of the trial court unless the preponderance of the evidence is otherwise. T. C. A. Section 27-303.

Therefore, we have reviewed the evidence heard by the Chancellor to determine whether or not it prepondrates against the finding of the Chancellor. In our opinion it does not.

The defendant, C. L. Bailey, indicated upon direct examination that he knew nothing about the Waller property or the contract between them and Hodges prior to the

time he purchased the contract and notes from Hodges on or about March 13, 1957, though he said he did ride by the property once for the purpose of giving Mr. Hodges an estimate as to the cost of the duplex. However, the proof shows unequivocally that the contract between Hodges and the Wallers was prepared in Bailey's office by Bailey's secretary.

Another incident which reflects upon Mr. Bailey's good faith in the matter is the fact that he proceeded to build a duplex on said property under a building permit which authorized only a five-room one family dwelling. Under the zoning regulations of the City of Memphis a building permit would not be let for a duplex because of the smallness of the size of the lot. Apparently Mr. Bailey knew of this restriction so instead of filing plans and application for a building permit for a duplex he, or one of his employees, filed plans and application for a five-room one family dwelling. Even though he had a building permit for only a five-room dwelling he started building a duplex on the lot under the contract.

After he had been enjoined by the complainants from proceeding further with the contract Mr. Bailey filed plans and made application for a variance in the zoning regulations so as to permit him to build a duplex on this particular lot. This application was granted and at the time of the trial Bailey did have a legal building permit for a duplex.

While Mr. Hodges negotiated the contract with the complainants under the name of Hodges Construction Company the proof shows that he has no business address, he had no employees and apparently has no construction equipment of his own.

The proof also shows that he has obtained a number of building contracts and negotiated them to Mr. Bailey who is in the construction business. Under these circumstances we are impelled to the conclusion that in the present case Mr. Hodges and Mr. Bailey were working in collusion with Mr. Hodges being delegated the task of obtaining the construction contract under favorable terms with adequate security therefor with the understanding that Mr. Bailey would go through the procedure of formally buying the contract and security from Mr. Hodges and then perform the construction work called for by the contract.

Both complainants testified that the contract price was to be only $8,000 and that under no circumstances would they have agreed to place an encumbrance upon the home place of Pansy Waller.

Of their testimony the Chancellor, in his finding of fact, said: ''The Court believes the testimony of these simple, uneducated people, who testified in a plain and straight-forward, although in a somewhat homely and colloquial fashion. However, the Court need not rely on the testimony alone of the complainants, for the testimony is corroborated in many ways.''

The promptness with which these complainants brought suit; the fact that these complainants never talked to an attorney about the contract saying that the defendant Hodges told them that they did not need an attorney and in effect dissuaded them from so doing; the fact that the papers were all prepared by Mr. Hodges including a deed of trust on complainant Pansy Waller's home before he had ever talked to Pansy Waller even one time; and the fact that the defendant Hodges did not

leave a copy of the contract or deed of trust with the parties at the time of the signing of these documents, all impel us to the conclusion that the evidence not only does not preponderate against the finding of the Chancellor but that actually it preponderates in favor of the finding of the Chancellor.

From Gibson's Suits in Chancery, 5th Edition, Vol. 1, Section 456, we quote as follows:

"Sec. 456. Fraud Proved By Circumstances.— Fraud is seldom established by direct and positive proof, and such proof is not necessary. Generally, the first effort of a man, who intends to commit a fraud, is to throw a veil over the transaction, to conceal it from discovery, to baffle all attempts at detection, and to shield it against attack. No man willingly furnishes the proof of his own turpitude. Fraud is, for this reason, rarely perpetrated openly and in broad daylight. It is committed in secret, and is usually hedged about by every guard that can be devised to prevent its discovery and exposure. Its path is crooked and circuitous, its footprints are carefully covered up, the signs of its operations are diligently removed, and the mask of honesty and good faith is put over the face of the real transaction. For these reasons, fraud is usually proved by circumstantial evidence.

"In consequence of the abhorrence with which fraud is regarded by Courts of Conscience, in consequence of the heinousness of the offence, and, in consequence of the artifices, devices and coverings used to conceal it, and to baffle detection, a wide range of evidence is allowed in proving its existence; and

Courts of Equity do not restrict themselves by the same rigid rules that Courts of Law do, in the investigation of fraud, and in the evidence and proofs required to establish it.

"Fraud assumes many shapes, disguises and subterfuges, and is generally so secretly hatched that it can only be detected by a consideration of facts and circumstances, which are frequently trivial, remote and disconnected, and which cannot be interpreted without bringing them together, and contemplating them all in one view. In order to do this it is necessary to pick one fact or circumstance here, another there, and a third yonder, until the collection is complete. Each detached piece of evidence is not, therefore, to be rejected when offered, because apparently trivial. A wide latitude of evidence is allowed; and if a fact or circumstance relates directly, or indirectly, to the transaction, it is admissible, however weak or slight it may be, its relevance depending, not upon its weight or force, but upon its bearing or tendency."

See also the recent case of Anderson v. Nichols, 39 Tenn. App. 503, 286 S. W. (2d) 96, in which our Court of Appeals upheld a decree of the Chancery Court setting aside as fraudulent a deed valid upon its face, signed by the grantor and properly acknowledged before a Notary Public.

Accordingly, the assignments of error are all overruled and the decree of the chancellor will be affirmed.

The cause will be remanded to the chancery court for further proceeding consistent herewith.

Avery, P. J. (Western Section), and Bejach, J., concur.