IN THE SUPREME COURT OF TENNESSEE
AT NASHVILLE
October 6, 2009 Session

**JOSEPH DAVIS ET AL. v. PATRICK J. McGUIGAN ET AL.**

**Appeal by Permission from the Court of Appeals**
**Circuit Court for Davidson County**
**No. 05C-115     Hamilton V. Gayden, Jr., Judge**

_____

**No. M2007-02242-SC-R11-CV - Filed October 26, 2010**

_____

WILLIAM C. KOCH, JR., J., dissenting.

        This appeal involves the liability of a real estate appraiser to two property owners for an appraisal prepared for the use of the bank that loaned the property owners funds to construct an expensive, custom-built house.  The Court today reverses the conclusions of both the trial court and the Court of Appeals that the appraiser was entitled to a summary judgment dismissing the property owners' intentional misrepresentation and Tennessee Consumer Protection Act claims.  I respectfully disagree.  The only reasonable conclusion to be drawn from the undisputed facts of this case is that the appraiser is entitled to a judgment as a matter of law with regard to the property owners' intentional misrepresentation and Tennessee Consumer Protection Act claims.

**I.**

        Joseph and Kimberly Davis married in September 2000.  Both were college graduates and were gainfully employed.  Mr. Davis had worked for twenty-four years as a finance manager for General Motors. Ms. Davis had worked for eighteen years as a sales executive but had recently changed jobs.  Their combined annual income was approximately $158,000.

        The Davises decided that they would mark their marriage by building their dream home.  Even before their wedding, they purchased an unimproved corner lot in the upscale Horseshoe Bend subdivision near Nashville for $135,000.  Following their marriage, they worked with a custom builder to prepare plans for a 3,940 square foot ranch-style house with three bedrooms, three and one-half bathrooms, and many luxurious amenities.  The Davises' contractor informed them that the house would cost $595,394.50 to construct.

The Davises then contacted SunTrust Bank to arrange financing for their new house. Based on its estimate that the value of the house and lot was $735,000, the bank told the Davises that the largest loan they could qualify for would be $580,000 if they desired to avoid the additional expense of private mortgage insurance. Accordingly, on May 12, 2002, the Davises completed and signed an application for a $580,000 loan. While this application did not obligate the Davises to borrow the funds from the bank, it served the purpose of locking in a favorable interest rate as long as the loan was closed within sixty days.

The processing of the Davises' loan application was slowed for three reasons. First, the loan-to-value ratio of their loan exceeded 75%. Second, the debt-to-income ratio of their loan exceeded 38%. Third, Ms. Davis had recently changed jobs and had been employed by her current employer for a relatively short period of time. These circumstances necessitated obtaining additional information from the Davises and required additional internal bank approvals. Eventually, on June 17, 2002, the bank approved the Davises' loan application.

On June 18, 2002, with the deadline for the locked-in interest rate fast approaching, the bank faxed a request for a residential appraisal to Patrick McGuigan, one of the six appraisers who regularly performed residential appraisals for the bank. The bank provided Mr. McGuigan with the name of the borrowers, the name of the builder, and the address of the property. It also informed Mr. McGuigan that the "sales price" was $735,000.[1] At the top of the bank's request, written in hand, was the word "Rush!".[2] The bank also provided Mr. McGuigan with the plans and specifications for the house.

Mr. McGuigan was able to prepare his appraisal for the bank in one day, largely because the loan involved new construction. Using the "cost approach," he examined the plans and specifications for the proposed house and estimated that the value of the lot and planned house was $731,000. Mr. McGuigan also examined the sales of comparable houses in the area to determine the value of the Davises' new house. After deciding that many of the amenities that the Davises planned to include in their house were not found in other houses in the Horseshoe Bend subdivision, Mr. McGuigan decided to select comparable houses in a nearby subdivision called LaurelBrooke. After adjusting for the differences between the Davises' house and the comparable houses, Mr. McGuigan estimated that the

---

[1]The bank employees later testified without contradiction that it was commonplace for them to include the "sales price" on appraisal requests and that most appraisers asked for the "sales price" if it was not provided.

[2]The bank employees later testified without contradiction that they regularly marked their appraisal request with "rush" because it was the nature of the business.

market value of the Davises' house, if built according to the plans and specifications, would be $735,000.

On June 19, 2002, Mr. McGuigan forwarded a copy of his appraisal report and an invoice for $325 to the bank. He included with his appraisal a copy of the Uniform Standards of Professional Appraisal Practice ("USPAP") Compliance Addendum. Under the heading "Purpose of the Appraisal," Mr. McGuigan included the following statement:

> This appraisal report is prepared for the sole and exclusive use of the lender as mentioned in the client section of this report, to assist with the mortgage lending decision. It is not to be relied upon by any third parties for any purpose, whatsoever.

When the bank received Mr. McGuigan's appraisal, it informed the Davises that the proposed house and property had been appraised for $735,000 and that their loan application had been approved. The Davises did not request a copy of the appraisal despite being informed in writing that they could request a copy of the report at any time.

On June 21, 2002, the Davises signed a cost-plus contract with their contractor in which they agreed to pay $60,000 plus the actual cost of the construction of the house. This contract did not contain any financing contingencies. Around this same time, the Davises took out a loan against the equity in their current residence to use as a down payment. This loan provided sufficient additional funds necessary to complete the project and to enable the Davises to avoid purchasing private mortgage insurance.

On July 2, 2002, as a result of the timely efforts of the bank staff and Mr. McGuigan, the Davises and the bank held a closing on the Davises' mortgage loan at the agreed upon interest rate. During the closing, the Davises signed a final Uniform Residential Loan Application and a Construction and Permanent Loan Agreement. The following disclaimer appears in the "Acknowledgment and Agreement" section of the loan application immediately above the Davises' signatures:

> [T]he Lender, its agents, successors and assigns make no representations or warranties, express or implied, to the Borrower(s) regarding the property, the condition of the property, or the value of the property.

Even though the bank provided the Davises with a copy of Mr. McGuigan's appraisal at the closing, the Davises did not read or review it.

-3-

The construction of the Davises' new home was substantially complete by June 2003. The loan agreement required Mr. McGuigan to recertify his original appraisal after the house was substantially completed. This process called for viewing the house as constructed and comparing it with recent sales of comparable houses. On June 17, 2003, Mr. McGuigan completed his recertification stating that the house's value was at least $735,000 in his opinion.

The Davises were pleased with their new house. However, in the Fall of 2004, changed circumstances required the Davises to reconsider their personal finances. In September 2004, the Davises applied to SunTrust Bank for a home equity loan to pay credit card debt. In November 2004, Ms. Davis lost her job, thereby significantly reducing the Davises' combined income. The Davises also separated in November 2004.

The bank declined to approve the Davises' application for a home equity loan after a "desk top" appraisal of their house indicated that the current market value of the house was less than the balance of the mortgage loan.[3] In light of their circumstances, the Davises retained a realtor to sell their house. They listed the house for $679,900 and sold the house for $660,000 to the first buyer who made an offer. This sale closed on April 8, 2005. Five days later, on April 13, 2005, Mr. Davis filed for divorce in the Circuit Court for Williamson County.

On April 20, 2005, one week after Mr. Davis filed for divorce, the Davises filed a complaint in the Circuit Court for Davidson County seeking to recover damages from Mr. McGuigan. Among their many claims, the Davises alleged that Mr. McGuigan had intentionally misrepresented the fair market value of their house when he prepared his appraisals and that Mr. McGuigan had also violated the Tennessee Consumer Protection Act. In addition to compensatory damages, the Davises sought either punitive damages or treble damages under the Tennessee Consumer Protection Act.

After over one year of discovery, Mr. McGuigan filed a motion for summary judgment seeking dismissal of all of the Davises' claims. He supported this motion with voluminous evidentiary materials and with the Davises' responses to his statement of undisputed material facts. The Davises opposed the motion with evidentiary materials of their own, including affidavits from three experts regarding the deficiencies in Mr. McGuigan's appraisal methodology. Mr. McGuigan moved to strike these three affidavits.

---

[3]A "desktop" appraisal is a computer-generated appraisal based on tax records. The desktop appraisal performed in the Fall of 2004 estimated that the market value of the Davises' house was $510,000. The face amount of the original mortgage loan was $580,000.

The trial court heard both the motion to strike the affidavits of the Davises' three experts and Mr. McGuigan's motion for summary judgment on February 2 and 23, 2007. During the February 23, 2007 hearing, the trial court granted Mr. McGuigan's motion to strike the affidavits of two of the Davises' three experts. On March 7, 2007, the trial filed an order excluding the affidavits of the two experts and a separate order granting Mr. McGuigan a summary judgment with regard to the Davises' intentional misrepresentation and Tennessee Consumer Protection Act claims.

The case proceeded on the Davises' negligent misrepresentation claim against Mr. McGuigan. A trial date was set for September 27, 2007 – almost two and one-half years after the filing of the complaint. However, following a hearing on September 14, 2007, the trial court entered an order on September 21, 2007, determining that two of the Davises' expert witnesses were not qualified to provide expert opinions regarding the standard of care of appraisers of real property in Middle Tennessee or the value of real property in Middle Tennessee.[4] Hobbled by the exclusion of two of their expert witnesses, the Davises filed a notice of the voluntary dismissal of their negligent misrepresentation claim on September 21, 2007. The Davises filed a notice of appeal on September 28, 2007.

Before the Court of Appeals, the Davises took issue with the trial court's decision to grant Mr. McGuigan a summary judgment on their intentional misrepresentation and Tennessee Consumer Protection Act claims. They also took issue with the trial court's decisions to exclude their expert witnesses. For his part, Mr. McGuigan objected to the trial court's denial of his motion to exclude the affidavit of the third expert witness whom the Davises had retained to oppose his summary judgment motion.

The Court of Appeals filed its opinion on September 10, 2008, concluding that the trial court had correctly granted the summary judgment dismissing the Davises' fraudulent misrepresentation and Tennessee Consumer Protection Act claims. *Davis v. McGuigan*, No. M2007-02242-COA-R3-CV, 2008 WL 4254150, at *9 (Tenn. Ct. App. Sept. 10, 2008). Because the Davises had voluntarily dismissed their negligent misrepresentation claim, the Court of Appeals declined to address the trial court's post-summary judgment evidentiary rulings or its denial of Mr. McGuigan's motion for summary judgment on the Davises' negligent misrepresentation claim. *Davis v. McGuigan*, 2008 WL 4254150, at *7-9. The Court of Appeals did not explicitly address the issue raised by Mr. McGuigan regarding the denial of his motion to strike Mr. Turner's affidavit filed in opposition to the motion for summary judgment.

---

[4]The record reflects that one of the Davises' witnesses had received a warning from the Tennessee Real Estate Commission regarding engaging in unlicensed appraisal practice.

The Davises filed a Tenn. R. App. P. 11 application for permission to appeal with regard to the summary judgment dismissing their intentional misrepresentation and Tennessee Consumer Protection Act claims against Mr. McGuigan. Mr. McGuigan did not file a Tenn. R. App. P. 11 application. However, in his brief filed after this Court granted the Davises' application for permission to appeal, Mr. McGuigan took issue with the portion of the trial court's May 23, 2007 order denying his motion to strike the affidavit of the Davises' third expert filed in opposition to his summary judgment motion.

**II.**

Summary judgments are not disfavored procedural devices. *Eskin v. Bartee*, 262 S.W.3d 727, 732 (Tenn. 2008); *Fruge v. Doe*, 952 S.W.2d 408, 410 (Tenn. 1997). They provide a disciplined process that enables courts to pierce through the pleadings to determine whether a particular case justifies the time and expense of a trial. *Byrd v. Hall*, 847 S.W.2d 208, 210 (Tenn. 1993). Accordingly, a summary judgment is proper in virtually any civil case that can be resolved on legal issues alone. *Green v. Green*, 293 S.W.3d 493, 513 (Tenn. 2009).[5]

A court should grant a summary judgment when the undisputed facts, as well as the inferences reasonably drawn from the facts, permit the conclusion that the party seeking the summary judgment is entitled to a judgment as a matter of law. *Griffis v. Davidson Cnty. Metro. Gov't*, 164 S.W.3d 267, 284 (Tenn. 2005); *Pero's Steak & Spaghetti House v. Lee*, 90 S.W.3d 614, 620 (Tenn. 2002). A defendant seeking a summary judgment is entitled to a judgment as a matter of law when, relying on the undisputed facts, it "affirmatively negate[s]" an essential element of the plaintiff's case or when it "show[s]" that the plaintiff cannot prove an essential element of its claim at trial. *Hannan v. Alltel Publ'g Co.*, 270 S.W.3d 1, 9 (Tenn. 2008).

An order granting a summary judgment is not entitled to the presumption of correctness on appeal. *Stanfill v. Mountain*, 301 S.W.3d 179, 184-85 (Tenn. 2009); *Amos v. Metro. Gov't of Nashville & Davidson Cnty.*, 259 S.W.3d 705, 710 (Tenn. 2008). Accordingly, in each case, the appellate courts must make a fresh determination that the requirements of Tenn. R. Civ. P. 56 have been met. *Green v. Green*, 293 S.W.3d at 514;

---

[5]For example, while this Court has noted that summary judgments are "almost never an option" in contested workers' compensation cases, *Berry v. Consol. Sys., Inc.*, 804 S.W.2d 445, 446 (Tenn. 1991), we have affirmed summary judgments in workers' compensation cases when the party seeking the judgment has complied with all the requirements of Tenn. R. Civ. P. 56. *Wait v. Travelers Indem. Co.*, 240 S.W.2d 220, 230 (Tenn. 2007) ; *Dye v. Witco Corp.*, 216 S.W.3d 317, 322-23 (Tenn. 2007).

*Staples v. CBL & Assocs.*, 15 S.W.3d 83, 88 (Tenn. 2000); *Mason v. Seaton*, 942 S.W.2d 470, 472 (Tenn. 1997).

Appellate courts reviewing a summary judgment must consider the evidence in the light most favorable to the non-moving party and must draw all reasonable inferences in the non-moving party's favor. *Mills v. CSX Transp., Inc.*, 300 S.W.3d 627, 632 (Tenn. 2009); *Martin v. Norfolk S. Ry.*, 271 S.W.3d 76, 84 (Tenn. 2008). When reviewing the evidence, they must first determine whether factual disputes exist. If a factual dispute exists, the reviewing courts must determine whether the disputed fact is material to the claim or defense being tested by the summary judgment motion and whether the disputed fact creates a genuine issue for trial. *Eskin v. Bartee*, 262 S.W.3d at 732; *Cumulus Broad., Inc. v. Shim*, 226 S.W.3d 366, 374 (Tenn. 2007); *McCarley v. W. Quality Food Serv.*, 960 S.W.2d 585, 588 (Tenn. 1998). However, no factual dispute exists when the undisputed facts and the inferences drawn from the undisputed facts permit a reasonable fact-finder to reach only one factual conclusion. *Gossett v. Tractor Supply Co.*, ___ S.W.3d ___, ___, 2010 WL 3633459, at *6 (Tenn. 2010); *Giggers v. Memphis Hous. Auth.*, 277 S.W.3d 359, 364 (Tenn. 2009).

## III.

We turn first to the issue raised by Mr. McGuigan regarding the admissibility of one of the affidavits offered by the Davises to oppose his motion for summary judgment. Mr. McGuigan asserts that the trial court erred by denying his motion to strike an affidavit[6] prepared by J. Donald Turner, one of the Davises' experts, in an effort to shore up his earlier deposition. The resolution of this issue affects the facts that can properly be considered in determining whether Mr. McGuigan is entitled to a judgment as a matter of law with regard to the Davises' intentional misrepresentation and Tennessee Consumer Protection Act claims.

## A.

The legal sufficiency of the evidentiary materials in the record when a court considers a summary judgment motion is of pivotal importance. Affidavits are the most common form of evidence submitted at the summary judgment stage. 10A Charles A. Wright et al., *Federal Practice and Procedure* § 2722, at 377 (3d ed. 1998) ("*Federal Practice and Procedure*"). The substance of evidence in affidavits submitted by the parties to support and to oppose a summary judgment motion must be admissible at trial. Tenn. R. Civ. P. 56.06; *Green v. Green*, 293 S.W.3d at 513; *Messer Griesheim Indus. v. Cryotech of Kingsport, Inc.*, 45

---

[6] A motion to strike is the proper vehicle for challenging the admissibility of evidence at the summary judgment stage of the proceeding. 11 James Wm. Moore et al., *Moore's Federal Practice and Procedure* § 56.14[4][a] (3d ed. 2009).

S.W.3d 588, 598 (Tenn. Ct. App. 2001); *see also* 10B *Federal Practice and Procedure* § 2738, at 330, 342. Accordingly, these affidavits are likely to be scrutinized carefully by the courts to evaluate their probative value and to determine whether they meet the standards prescribed in Tenn. R. Civ. P. 56.06. *See* 10A *Federal Practice and Procedure* § 2722, at 379.

When issues have been raised regarding the compliance of affidavits with the standards prescribed by Tenn. R. Civ. P. 56 or the admissibility of evidence contained in these affidavits, the threshold issue of admissibility should be resolved before determining whether or not unresolved questions of fact exist. *Travis v. Ferraraccio*, No. M2003-00916-COA-R3-CV, 2005 WL 2277589, at *4-5 (Tenn. Ct. App. Sept. 19, 2005) (No Tenn. R. App. P. 11 application filed); *see also United States v. Hangar One, Inc.*, 563 F.2d 1155, 1157-58 (5th Cir. 1977); *EEOC v. Fostoria Restaurants, Inc.*, 25 F. Supp. 2d 803, 806 (N.D. Ohio 1998); *Montgomery v. Montgomery*, 205 P.3d 650, 658 (Idaho 2009); *Chavez v. Ronquillo*, 612 P.2d 234, 237 (N.M. Ct. App. 1980). After these threshold questions have been addressed, the trial court may then determine whether, taking the strongest view of the admissible evidence in favor of the non-moving party, there remain any genuine issues of material fact to be decided at trial. *Byrd v. Hall*, 847 S.W.2d at 210-11.

Thus, before determining whether the lower courts properly determined that Mr. McGuigan was entitled to a summary judgment with regard to the Davises' intentional misrepresentation and Tennessee Consumer Protection Act claims, it is appropriate to address and to decide definitively the admissibility of the substance of Mr. Turner's affidavit. If Mr. McGuigan is correct that the substance of Mr. Turner's affidavit is inadmissible, the affidavit should play no role in the consideration of Mr. McGuigan's summary judgment motion. By the same token, if Mr. McGuigan is not correct, then the facts and opinions contained in Mr. Turner's affidavit can properly be considered in determining whether Mr. McGuigan is entitled to a summary judgment.

Decisions regarding the admissibility of evidence are discretionary, and, therefore, the appellate courts review these decisions using the "abuse of discretion" standard. *Biscan v. Brown*, 160 S.W.3d 462, 468 (Tenn. 2005); *Mercer v. Vanderbilt Univ., Inc.*, 134 S.W.3d 121, 131 (Tenn. 2004). This standard applies to appellate review of decisions by a trial court when it is acting as a gatekeeper with regard to the admissibility of an expert witness's opinion testimony. Accordingly, the appellate courts review decisions regarding the qualifications, admissibility, relevancy, and competency of expert testimony using the abuse of discretion standard. *Brown v. Crown Equip. Corp.*, 181 S.W.3d 268, 273 (Tenn. 2005); *McDaniel v. CSX Transp., Inc.*, 955 S.W.2d 257, 263-64 (Tenn. 1997). This standard of review should also be used at the summary judgment stage. *General Electric Co. v. Joiner*, 522 U.S. 136, 142-43 (1997).

**B.**

Mr. McGuigan asserts that the trial court erred by failing to exclude Mr. Turner's affidavit on two grounds. First, he insists that Mr. Turner's opinion regarding the market value of the Davises' house is flawed because it is not based on the plans and specifications for the Davises' house that were prepared by Mr. Frasch. Second, he asserts that there is an irreconcilable conflict between Mr. Turner's affidavit and his deposition that undermines the admissibility of both.

In his affidavit submitted in opposition to Mr. McGuigan's summary judgment motion, Mr. Turner opined that the market value of the Davises' house when Mr. McGuigan appraised it in June 2002 for $735,000 was really $550,000. Mr. McGuigan insists that the trial court should not have permitted Mr. Turner to give an opinion regarding the market value of the house because Mr. Turner was not provided with the information necessary to appraise new construction and, therefore, Mr. Turner "did not follow his own stated method of appraising new construction."

Mr. Turner prepared his affidavit after he was deposed. While several of his answers to questions during his deposition are ambiguous with regard to the documents he consulted in order to arrive at his appraised value of the Davises' house, Mr. Turner states unequivocally in his affidavit that he reviewed the complaint, the answer, Mr. McGuigan's responses to the Davises' first set of interrogatories and requests for production of documents, and the transcript of Mr. McGuigan's deposition and the exhibits to the deposition. Included among these documents was Mr. McGuigan's file which purportedly included the plans and specifications and the estimated cost of construction. Accordingly, while Mr. Turner's testimony in his deposition could provide fertile ground for cross-examination, it does not support Mr. McGuigan's claim that Mr. Turner's opinion regarding the market value of the Davises' house is so lacking in evidentiary support that it should have been excluded.

Mr. McGuigan also insists that Mr. Turner's deposition testimony is in such conflict with his later affidavit that the trial court should have held that they were both inadmissible. This argument is premised on what is commonly referred to as the "cancellation rule" – contradictory statements by the same witness that go unexplained or uncorroborated by other evidence cancel each other out. *Taylor v. Nashville Banner Publ'g Co.*, 573 S.W.2d 476, 482-83 (Tenn. Ct. App. 1978). While the cancellation rule applies to a witness's deposition and affidavit filed in support of or in opposition to a motion for summary judgment, the court must view the challenged evidence in a light most favorable to the opponent of the summary judgment motion. *Helderman v. Smolin*, 179 S.W.3d 493, 502 (Tenn. Ct. App. 2005); *Church v. Perales*, 39 S.W.3d 149, 170 (Tenn. Ct. App. 2000).

During his deposition on January 23, 2007, Mr. Turner was quite diffident about whether Mr. McGuigan had intentionally created an inaccurate appraisal of the Davises' house. His answer was essentially, "I don't know." Three days later, Mr. Turner signed an affidavit stating, in part, that "[w]hile I don't know whether he [Mr. McGuigan] intentionally provided an inaccurate appraised value, I do believe that he knowingly performed an appraisal using methods not in conformance with reliable and accepted standards in the industry or with USPAP."

While these statements are certainly equivocal, they are not necessarily contradictory. The crux of Mr. Turner's testimony, viewed in the light most favorable to the Davises, is that, although he was unwilling to accuse Mr. McGuigan of intentionally providing an inaccurate appraisal, he believed that Mr. McGuigan "knowingly" deviated from accepted practices by selecting his comparable properties from the LaurelBrooke subdivision rather than from Horseshoe Bend. While there may very well be appropriate questions regarding the weight to be given to Mr. Turner's testimony, determining the weight of the evidence is not appropriate at the summary judgment stage. *Downs ex rel. Downs v. Bush*, 263 S.W.3d 812, 815 (Tenn. 2008); *Wilson v. Patterson*, 73 S.W.3d 95, 104 (Tenn. Ct. App. 2001). Mr. Turner's deposition testimony and affidavit are not so fatally inconsistent that they should be treated as "no evidence" at all. *See Johnston v. Cincinnati, N.O. & T.P. Ry.*, 146 Tenn. 135, 160, 240 S.W. 429, 436 (1922) (reversing jury decision based on unexplained, inconsistent testimony).

## C.

Even though Mr. Turner's statements in his deposition and affidavit are not self-cancelling, they suffer from another fatal flaw plainly evident in Mr. Turner's own testimony. When asked during his deposition whether it was his opinion that Mr. McGuigan intentionally performed an inaccurate appraisal, Mr. Turner responded: "I would say that he performed an inaccurate appraisal. Now was it his intention or not, I don't know." After being pressed to explain "how far your opinion goes," Mr. Turner replied, "[y]ou know, I just can't read another appraiser's mind." After speculating about how Mr. McGuigan might have performed the appraisal, Mr. Turner was asked, "[d]o you think that's what happened?" Mr. Turner answered, "I don't know. You know, that's what I said, I can't tell you what was his intention. I said this was a possibility that it could have happened, but I have no idea."

In the context of medical causation evidence that requires an expert opinion, this Court has noted that an expert physician's testimony as to what "is *possible* is no evidence at all" because "[h]is opinion as to what is possible is no more valid than the jury's own speculation as to what is or is not possible." *Lindsey v. Miami Dev. Corp.*, 689 S.W.2d 856, 862 (Tenn. 1985) (quoting *Palace Bar, Inc. v. Fearnot*, 381 N.E.2d 858, 864 (Ind. 1978)).

-10-

A corollary to the lack of value of opinions regarding "possibilities" is that experts are not permitted to give opinions regarding the ultimate issue of fact if the fact-finder is capable of drawing its own conclusions without the aid of expert testimony. *State v. Turner*, 30 S.W.3d 355, 360 (Tenn. Crim. App. 2000); *see also* 10B *Federal Practice & Procedure* § 2738, at 345-46.

These principles are applicable here. Mr. Turner's testimony regarding whether Mr. McGuigan intentionally performed an inaccurate appraisal is, by his own admission, speculation. He is no more qualified than the jury to determine what Mr. McGuigan believed the real market value of the Davises' house was. Significant portions of Mr. Turner's opinion testimony amount to nothing more than conjecture about Mr. McGuigan's beliefs and intent. Thus, because of the speculative nature of Mr. Turner's testimony, the trial court erred by failing to strike the portions of his deposition and affidavit regarding Mr. McGuigan's beliefs and intent. Accordingly, Mr. Turner's testimony regarding Mr. McGuigan's beliefs or intent in performing the appraisal should not be considered in determining whether the trial court properly granted the summary judgment dismissing the Davises' intentional misrepresentation and Tennessee Consumer Protection Act claims against Mr. McGuigan.

## IV.

Unlike other recent appeals involving summary judgments that have been considered by this Court,[7] this case does not require the Court to analyze whether Mr. McGuigan, as the party seeking the summary judgment, presented sufficient evidence to successfully shift the burden of production to the Davises. The Davises do not dispute that Mr. McGuigan successfully shifted the burden of production to them. Accordingly, the Court has properly pointed out that Mr. McGuigan, as the moving party, carried his burden of presenting evidence that negated two essential elements of the Davises' intentional misrepresentation claim. These elements relate to Mr. McGuigan's intent and knowlege when he prepared the appraisal and the reasonableness of the Davises' reliance on Mr. McGuigan's appraisal. The pivotal question is whether the Davises have succeeded in demonstrating the existence of genuine material factual disputes that warrant the time and expense of a trial. I have concluded that they have not.

## A.

The recipients of an allegedly fraudulent misrepresentation may recover damages only if they prove that the person making the representation did so recklessly, with knowledge that

---

[7]*See, e.g., Hannan v. Alltel Publ'g Co.*, 270 S.W.3d at 8-9.

it was false, or without belief that the representation was true. *Walker v. Sunrise Pontiac-GMC Truck, Inc.*, 249 S.W.3d 301, 311 (Tenn. 2008); Restatement (Second) of Torts § 526 (1977). Despite their best efforts, the Davises have been unable to present any direct evidence substantiating their assertion that Mr. McGuigan "intentionally or recklessly misrepresented that his best estimate of the value of the plaintiffs' proposed construction was $735,000."

The Davises assert that the inferences from four undisputed facts should be sufficient to create a jury question with regard to Mr. McGuigan's state of mind when he performed the appraisal. They first point to the undisputed fact that SunTrust marked its request for the appraisal "Rush!" when it faxed the request to Mr. McGuigan on June 18, 2002. Second, they point out that the request for an appraisal stated that the "sales price" was $735,000. Third, they point out that Mr. McGuigan based his appraisal, in part, on properties in LaurelBrooke rather than in Horseshoe Bend. Finally, they point out that Mr. McGuigan completed and returned his appraisal only one day later on June 19, 2002.

The parties' lengthy and detailed discovery places these four facts in clear context. It is undisputed that the bank's mortgage processors frequently marked their requests for appraisals with "rush" because it was the nature of the business. With regard to the Davises' loan, time was becoming of the essence in mid-June because of the fast-approaching July 15, 2002 deadline on the lock-in agreement on the loan's interest rate. The quick completion of the appraisal enabled the parties to close the loan on July 2, 2002.

The witnesses also testified uniformly that it was commonplace to include the "sales price" on appraisal requests. While a number of the witnesses could not explain the reason for the practice, there was little disagreement that when the sales price was not provided, most appraisers regularly called to obtain it. The Davises were unable to uncover any evidence that would enable a reasonable fact-finder to conclude that the bank passed along the "sales price" on properties for which it sought appraisals in order to prompt its appraisers to provide an appraisal for the amount of the "sales price."

Mr. McGuigan's choices regarding comparable properties were closely scrutinized during discovery. Several of the Davises' witnesses were skeptical of his choices. However, none of the Davises' witnesses provided admissible testimony that Mr. McGuigan selected comparable properties for the purpose of inflating the amount of his appraisal to coincide with the "sales price" listed on the bank's request for an appraisal.

Finally, there is no evidence in the record casting suspicion on the fact that Mr. McGuigan completed his appraisal in one day. The evidence shows that an appraisal of new construction can proceed expeditiously, as long as the appraiser has the plans and

specifications for the construction. It is undisputed that Mr. McGuigan based his appraisal on the plans and specifications prepared by the Davises' contractor, his personal inspection of the Horseshoe Bend subdivision and the Davises' lot, and the comparable properties that he and his staff selected.

**B.**

The recipients of an allegedly fraudulent misrepresentation may recover only if their reliance on the representation was reasonable or justifiable. *Walker v. Sunrise Pontiac-GMC Truck, Inc.*, 249 S.W.3d at 311; Restatement (Second) of Torts § 537(b) (1977). When the alleged misrepresentation is an opinion, the form of the opinion, the materiality of the opinion, and the relationship of the parties assume pivotal significance. For the purpose of this appeal, I have assumed, despite scant contemporaneous evidence, that the amount of the appraised fair market value of the Davises' house was material with regard to the loan transaction between the Davises and the bank.

The relationship between the parties and the form of the opinion in *Sunderhaus v. Perel & Lowenstein*, 215 Tenn. 619, 388 S.W.2d 140 (1965) differ markedly from the relationship between the Davises and Mr. McGuigan and the form of Mr. McGuigan's appraisal. In *Sunderhaus*, the seller of a ring, who stood to benefit directly from the transaction, provided the buyer a written warranty guaranteeing the value of the ring. *Sunderhaus v. Perel & Lowenstein*, 215 Tenn. at 621, 388 S.W.2d at 141. There is no such direct relationship or written warranty in this case.

By definition, an appraisal of real property is an opinion. Tenn. Code Ann. § 62-39-102(2) (2009) (defining "appraisal" as "the act or process of developing an opinion of value of identified real estate").[8] In this case, Mr. McGuigan, who was paid a flat fee for his appraisal regardless of its result, stated in the appraisal itself that he was providing an "estimated" value of the property. In addition, the bank was Mr. McGuigan's sole client. In both their preliminary and final loan applications, the Davises certified that neither the bank nor any of its agents "made . . . representations or warranties, express or implied, to the Borrower(s) regarding the property, the condition of the property, or the value of the property."[9]

---

[8]*See also* Tenn. Code Ann. § 62-39-102(16) defining "valuation appraisal" as "an analysis, opinion or conclusion prepared by a real estate appraiser that estimates the value of an identified parcel of real estate or identified real property at a particular point in time."

[9]The Davises completed and signed the final loan application after Ms. Gynp informed them that Mr. McGuigan had estimated that the fair market value of their home, if constructed in accordance with the plans
(continued...)

-13-

All the terms and conditions of the transaction were available to the Davises before the closing. A copy of Mr. McGuigan's appraisal was likewise available to them had they requested it. However, the Davises never talked with Mr. McGuigan nor read his appraisal until after this dispute arose even though they received a copy at the closing on July 2, 2002. The legal import and effect of the documents embodying the parties' rights and obligations in a transaction are not undermined by a party's decision not to read the documents. *See De Ford v. Nat'l Life & Accident Ins. Co.*, 182 Tenn. 255, 266-69, 185 S.W.2d 617, 621-22 (1945) (holding that a person cannot ordinarily avoid a contract on the ground that he did not read it); *Moody Realty Co. v. Huestis*, 237 S.W.3d 666, 676 (Tenn. Ct. App. 2007) (holding that one who signs a contract cannot later plead ignorance of its contents if there was an opportunity to read it before signing). Thus, as a matter of law, the Davises are presumed to have been aware of the disclaimers that were contained in the loan documents.

It is entirely undisputed that the Davises never talked with Mr. McGuigan and did not read or review his appraisal prior to the closing on July 2, 2002. By their own admission, the Davises could only have relied on the statement of the bank employee that their project had appraised for $735,000. The Court has properly pointed out that, for the purpose of an intentional misrepresentation claim, the plaintiff must rely "on the defendant's representation, not on how the representation was relayed." Under these circumstances, the only conclusion that a reasonable fact-finder can draw from the undisputed facts in this record is that the Davises did not, in fact, place any reliance on Mr. McGuigan's appraisal.

## C.

Based on the undisputed facts in this record, Mr. McGuigan's estimate of the fair market value of the Davises' house – which was only $4,000 more than the combined amount of the cost of the lot and the estimated construction cost of the house – was an opinion. Even though an opinion can provide the basis for a fraudulent misrepresentation claim, the undisputed facts in this record, and the inferences reasonably drawn from these facts, support only the following conclusions. First, based on the plain terms of all the documents in their loan transactions, the Davises could not, as a matter or law, rely on Mr. McGuigan's appraisal of the fair market value of their house. Second, the Davises have presented no admissible evidence that Mr. McGuigan prepared his appraisal of their house recklessly or with knowledge that he had not followed applicable appraisal standards or that he did not believe the conclusion in his appraisal that the fair market value of the Davises' house, if completed in accordance with the plans and specifications, would be $735,000. Finally, the Davises presented no evidence that Mr. McGuigan's appraisal was influenced, directly or

---

[9](...continued)
and specifications prepared by Mr. Frasch, would be $735,000.

indirectly, by the bank. Accordingly, the summary judgment dismissing the Davises' intentional misrepresentation claim should be affirmed.

**V.**

In addition to their fraudulent misrepresentation claim, the Davises allege that Mr. McGuigan violated the Tennessee Consumer Protection Act of 1977 (codified as amended at Tenn. Code Ann. §§ 47-18-101 to -130 (2001 & Supp. 2009)). Claims under this Act must be alleged with the same specificity applicable to fraud claims. *Harvey v. Ford Motor Credit Co.*, 8 S.W.3d 273, 275 (Tenn. Ct. App. 1999); *Humphries v. West End Terrace, Inc.*, 795 S.W.2d 128, 132 (Tenn. Ct. App. 1990). The Davises' complaint alleges, in the most general terms, that Mr. McGuigan's "actions in connection with the appraisal of the subject home constitute an unfair and deceptive trade practice."

The Tennessee General Assembly has identified forty-seven specific types of acts or practices that violate the Tennessee Consumer Protection Act.[10] However, the General Assembly was aware that "[f]raud assumes many shapes, disguises and subterfuges"[11] and that even as one fraud is defined and proscribed, another variant appears.[12] Accordingly, the Tennessee Consumer Protection Act also broadly proscribes engaging in any act or practice which is unfair or deceptive to the consumer. Tenn. Code Ann. § 47-18-104(a), (b)(27).

The Tennessee Consumer Protection Act does not provide a single standard applicable to all circumstances for determining whether a particular act or practice is unfair or deceptive for the purpose of Tenn. Code Ann. § 47-18-104(a) or Tenn. Code Ann. § 47-18-104(b)(27). *Fayne v. Vincent*, 301 S.W.3d 162, 177 (Tenn. 2009). In the proper circumstances, negligent misrepresentations may constitute an unfair or deceptive act or practice. *Fayne v. Vincent*, 301 S.W.3d at 177; *Holladay v. Speed*, 208 S.W.3d 408, 416 (Tenn. Ct. App. 2005). A deceptive act or practice is an act or practice "that causes or tends to cause a consumer to believe what is false or that misleads or tends to mislead a consumer as to a matter of fact." *Tucker v. Sierra Builders*, 180 S.W.3d 109, 116 (Tenn. Ct. App. 2005). An act is "unfair"

---

[10]*See* Tenn. Code Ann. § 47-18-104(b) (West 2010).

[11]*Waller v. Hodges*, 45 Tenn. App. 117, 130, 321 S.W.2d 265, 271 (1958) (quoting 1 Henry R. Gibson, *Gibson's Suits in Chancery* § 456, at 520 (5th ed. 1955)).

[12]*SEC v. Capital Gains Research Bureau*, 375 U.S. 180, 193 n.41 (1963) (quoting a June 30, 1759 letter from Lord Hardwicke to Lord Kames stating that "[f]raud is infinite, and were a Court of Equity once to lay down rules, how far they would go, and no farther, in extending their relief against it, or to define strictly the species or evidence of it, the jurisdiction would be cramped, and perpetually eluded by new schemes which the fertility of man's invention would contrive").

when it causes or is likely to cause substantial injury to consumers which is not easily avoidable by the consumers themselves and is not outweighed by countervailing benefits to consumers or to competition. *Tucker v. Sierra Builders*, 180 S.W.3d at 116-17 (citing 15 U.S.C. §45(n)).

Because of the generality of their complaint, I have assumed that the Davises' Tennessee Consumer Protection Act claim against Mr. McGuigan is based on Tenn. Code Ann. § 47-18-104(a), Tenn. Code Ann. § 47-18-104(b)(27), or both. As the litigation progressed and the Davises were required to state their claim more specifically, it became clear that their complaint against Mr. McGuigan was chiefly based on their belief that he purposely inflated his appraisal to equal the sales price listed on the bank's appraisal request by improperly selecting properties in the neighboring subdivision of LaurelBrooke to use as comparable properties.

The Davises have not leveled claims of predatory lending practices against the bank. Neither have they asserted that the bank conspired with Mr. McGuigan to obtain an inflated appraisal of their project for the purpose of inducing them to borrow money to construct a house that would be worth less than it cost to build. Nor have they presented admissible evidence that appraisers must base an appraisal of the market value of real property in a particular subdivision only on comparable real property in the same subdivision. At the most, they have proved that other appraisers might not have selected the same houses as comparable properties that Mr. McGuigan selected or that other appraisers might have made different adjustments to the comparable properties than Mr. McGuigan did.

An appraisal of real property is not the result of a scientific analysis, but rather it is a "subjective opinion which can and does differ from [one appraisal to] the next appraisal even though both may be based on real estate market trends." *In re Rehbein*, 49 B.R. 250, 253 (Bankr. D. Mass. 1985). Even the United States Supreme Court has noted that "common experience discloses that witnesses the most competent often widely differ as to the value of any particular lot; and there is no fixed or certain standard by which the real value can be ascertained." *Montana Ry. v. Warren*, 137 U.S. 348, 353 (1890). Accordingly, "[i]t is not surprising how many different results are had when more than one person looks at a piece of real estate." *In re Rehbein*, 49 B.R. at 252.

Based on the undisputed facts in this record and the inferences that can be reasonably drawn from these facts, the only reasonable conclusion to be drawn is that Mr. McGuigan's appraisal of the Davises' house was not deceptive for the purposes of Tenn. Code Ann. § 47-18-104(a) or Tenn. Code Ann. § 47-18-104(b)(27) because it did not contain a false or misleading statement of fact. Mr. McGuigan's appraisal stated only that it was an "estimate."

By the same token, the manner in which Mr. McGuigan prepared his appraisal was not unfair for the purposes of Tenn. Code Ann. § 47-18-104(a). Adopting a broad principle that appraisers of real property can be held liable whenever the actual sales price of a property is less than its appraised value will result in "defensive appraising which would depreciate loan values to the detriment of would-be borrowers." *Young v. Leader Fed. Sav. & Loan Ass'n*, No. 89-47-II, 1989 WL 67205, at *6 (Tenn. Ct. App. June 23, 1989) (No Tenn. R. App. P. 11 application filed). Accordingly, I would affirm the summary judgment dismissing the Davises' Tennessee Consumer Protection Act claim against Mr. McGuigan.

## VI.

The undisputed facts in this record, together with the inferences reasonably drawn from these facts, support the lower courts' conclusion that Mr. McGuigan was entitled to a dismissal of the Davises' intentional misrepresentation claim and Tennessee Consumer Protection Act claim as a matter of law. Accordingly, I respectfully part company with my colleagues and conclude that the summary judgment dismissing the Davises' intentional misrepresentation and Tennessee Consumer Protection Act claims against Mr. McGuigan should be affirmed.

I am authorized to state that Chief Justice Clark concurs in this opinion.

_____
WILLIAM C. KOCH, JR., JUSTICE

-17-